741 P.2d 267

**In the MATTER OF Stephen M. ZANG and C. Peter Whitmer, Members of the State Bar of Arizona, Respondents.**

**No. SB–86–0014–D.**

Supreme Court of Arizona,
En Banc.

July 8, 1987.

Lewis and Roca by Walter Cheifetz, Janet A. Napolitano, Phoenix, Wilcox & Ogden by M. Anne Wilcox, Golden, Colo., for respondents.

Meyer, Hendricks, Victor, Osborn & Maledon, P.A. by David G. Campbell, Edwin F. Hendricks, Langerman, Begam, Lewis and Marks by Frank Lewis, Phoenix, for State Bar.

FELDMAN, Vice Chief Justice.

In 1982 the State Bar charged attorneys C. Peter Whitmer and Stephen M. Zang ("respondents") with numerous ethical violations. The charges were presented to Special Local Administrative Committee S–25 of the State Bar (the "Committee"), which found Zang and Whitmer guilty of six ethical violations. The Committee recommended that Zang be suspended from the practice of law for one year and that Whitmer be suspended for six months. *See* Former Rules 31–35, Ariz.R.S.Ct., 17A A.R.S.[1]

Zang and Whitmer presented objections to the Committee's findings and recommendations to the Disciplinary Commission of the Supreme Court of Arizona (the "Commission"). After independently reviewing the record, hearing oral argument, and questioning respondents, the Commission affirmed five of the six ethical violations found by the Committee.[2] Specifically, the Commission found: first, that Zang and Whitmer had engaged in false and misleading advertising; second, that Zang had falsely presented himself, in advertisements and letters, as a Fellow of the Amer-

---

**1.** Because a probable cause determination was made in this case before February 1, 1985, the procedural aspects of this case are governed by our former rules, which were amended on September 7, 1984. *See* Order Deleting Rules 27 Through 49, Of The Supreme Court, And Substituting Amended Rules 27 Through 121, Rules Of The Supreme Court, In Their Place, 139 Ariz. LXXIX. The former rules will be cited as former Rule _____ throughout this opinion.

**2.** Pursuant to the Order cited in note 1, the substantive aspects of this case are governed by the Code of Professional Responsibility, former Rule 29(a), instead of the current Rules of Professional Conduct, Rule 42, Ariz.R.S.Ct., 17A A.R.S. (Supp.1986).

ican Academy of Forensic Sciences and of the American College of Legal Medicine; [3] third, that Zang had knowingly failed to honor a subrogation right; fourth, that Zang knowingly had accepted money tendered in error as part of a personal injury settlement; and fifth, that Zang had collected an excessive fee.[4] The Commission recommended that Zang be suspended for one year, Whitmer for ninety days.

Zang and Whitmer filed objections to the Commission's report with this court. They disputed the Commission's findings and recommendations with respect to each of the charges. Respondents also argue that they were denied their due process right to have the charges adjudicated by a fair and impartial tribunal.

We review respondents' objections as an independent trier of fact and law. *In re Kersting*, 151 Ariz. 171, 172, 726 P.2d 587, 588 (1986); *In re Neville*, 147 Ariz. 106, 108, 708 P.2d 1297, 1299 (1985). Although findings of the Committee and the Commission are entitled to "great weight," particularly when they turn on the credibility of witnesses, we will not impose discipline unless our independent review of the record convinces us that the Bar's charges are supported by clear and convincing evidence. We must be convinced, in other words, that the truth of the Bar's allegations is "highly probable." *Neville*, 147 Ariz. at 111, 708 P.2d at 1302; *accord Kersting*, 151 Ariz. at 172, 726 P.2d at 588.

## I. DUE PROCESS

Under the due process clause of the fourteenth amendment, respondents were entitled to a fair hearing before an impartial tribunal. *Withrow v. Larkin*, 421 U.S. 35, 46–47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975); *In re Davis*, 129 Ariz. 1, 3, 628 P.2d 38, 40 (1981). Respondents claim that the Committee violated their right to a fair

hearing in several ways. We turn first to the procedure followed by the Committee and then to the specifics of respondents' arguments.

### A. *Procedural Background*

The procedural facts giving rise to respondents' allegations are essentially undisputed. The State Bar assigned this matter to the Committee for investigation after receiving numerous complaints about respondents' practice and advertisements. The Committee appointed bar counsel, who investigated Zang and Whitmer during the fall of 1982. The investigation resulted in formal charges, contained in a ten-count complaint issued by the Committee on December 14, 1982. Respondents answered the complaint and then filed numerous motions alleging lack of notice, improper discovery requests, and lack of probable cause. Their motions were denied by the Committee. Respondents filed a special action,[5] but we declined jurisdiction on June 28, 1983.

On July 1, 1983, Edwin F. Hendricks, lead bar counsel, wrote to the Committee chairman scheduling a meeting with the Committee for July 5. The purpose of the meeting, according to the letter, was to discuss amending the complaint in light of interviews and research conducted by bar counsel during the six months since the complaint was filed. The letter also requested an "order giving the respondents and their counsel a deadline for responding to our long-standing discovery requests...."

The July 5 meeting was attended by two of the three Committee members and all bar counsel. Respondents' subsequent objections to the meeting and their efforts to discover the subjects discussed at the meeting, including the July 1 letter summarized above, were initially rebuffed by bar coun-

---

**3.** Whitmer was not charged in relation to this count.

**4.** The charges against Whitmer on the last three counts were dismissed by either the Committee or the Commission. Thus, Whitmer is directly involved only in the charge of false and misleading advertising.

**5.** In Arizona, relief formerly obtained by writs of prohibition, mandamus or certiorari is now obtained by "special action." Rule 1, Ariz.R.P. Sp.Act., 17A A.R.S.

sel's assertion of the attorney-client privilege. Mr. Hendricks, however, did give respondents an affidavit describing the general nature and content of the meeting.[6]

Consistent with Mr. Hendricks's prior affidavit, subsequent discovery permitted by this court revealed that the July 5 meeting was limited to a report of bar counsel's ongoing investigation and research. Bar counsel suggested that numerous charges be dropped, that other charges be modified to conform to the evidence discovered as of that date, and that one new charge be added. The Committee members present did not discuss the evidence in the presence of bar counsel. All three Committee members met later that day, without bar counsel, and decided to accept bar counsel's recommendations. No ex parte contacts between bar counsel and the Committee occurred after July 5, 1983, other than a few letters involving scheduling matters and one letter requesting bar counsel to explain which counts had been deleted from the complaint.

In August 1983, respondents filed motions to disqualify the Committee and bar counsel. The respondents' motions were based on bar counsel's ex parte contact with the Committee at the July 5 meeting and on the notion that the Committee had improperly combined investigative, prosecutorial, and adjudicative functions. After a hearing on these and other pretrial motions, the Committee denied respondents' motions for disqualification.

Respondents' disciplinary hearing before the Committee commenced six months after the July 5 meeting. The hearing occurred between January 23 and January 27 and between March 21 and March 24, 1984. At the end of the January session, the complaint was amended to add an additional charge. Respondents were not required to defend against the additional charge until the March session.

Unsuccessful before the Committee, respondents presented their due process arguments to the Disciplinary Commission during its review of the Committee's decision. After independently reviewing the record, the Commission unanimously concluded that "members of Special Administrative Committee S–25 were not biased [or] prejudiced," and that "[t]he conduct of Bar Counsel and the members of Special Committee S–25 did not constitute a denial of due process or of Respondents' right to a fair hearing." Commission Report ("CR"), at 7–8.

### B. Discussion

#### 1. Merging Investigative, Prosecutorial, and Adjudicative Functions

■ Respondents argue that the Committee deprived them of their due process right to an impartial tribunal by improperly combining the roles of investigator, prosecutor, and adjudicator. This argument is not supported by either our former rules or well-established precedent.

Former Rule 33(b)(2) required the Committee to conduct a preliminary investigation to determine whether there was probable cause, to conduct "such additional investigation as it deem[ed] necessary," and then, if warranted, to issue a formal complaint. Once the Committee issued a complaint, former Rule 35 required it to hold a formal hearing, decide the merits of the complaint, and then recommend discipline to the Commission and this court. The rules also authorized the Committee to select bar counsel to aid in the investigation and presentation of evidence. Former Rule 33(b)(2); see also Former Rule 33(b)(3) (staff examiners may be employed to conduct the investigation "under the supervision of bar counsel").

We rejected a procedural due process challenge to our former rules in Davis, supra. Relying on the United States Supreme Court's decision in Withrow, supra, Davis held that the Committee properly may conduct the initial investigation, determine probable cause, and then adjudicate

---

6. We are not limited to Mr. Hendricks's affidavit in ascertaining the details of the contacts between the Committee and bar counsel. Following oral argument before this court, we suspended the proceedings to allow Zang and Whitmer to conduct discovery into the contacts that took place between bar counsel and the Committee after charges had been filed.

the merits of a disciplinary action. 129 Ariz. at 3, 628 P.2d at 40. *Withrow* reasoned that these three functions have different purposes and are based on different evidence and standards. Consequently, just as judges may "issue arrest warrants on the basis" of probable cause and then preside over the defendant's criminal trial, Committee members may "receive the results of investigations, . . . approve the filing of . . . formal complaints instituting enforcement proceedings, and then . . . participate in the ensuing hearings. This mode of procedure does not violate . . . due process of law." *Withrow*, 421 U.S. at 56, 95 S.Ct. at 1469; *see also id.* at 52, 95 S.Ct. at 1467 (quoting 2 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 13.02, at 175 (1958)) ("[t]he case law, both federal and state, generally rejects the idea that the combination [of] judging [and] investigating functions is a [per se] denial of due process"); *Davis*, 129 Ariz. at 3, 628 P.2d at 40.

We reaffirm the principles announced in *Davis*. Committee members are people of integrity, legal training, and intellectual discipline, capable of determining probable cause and then fairly and impartially adjudicating the merits of a disciplinary action. Accordingly, we hold that the procedures authorized by our former rules do not violate due process of law.

The Committee's actions in the present case were clearly within the bounds set by our former rules. The procedures used here are far less troublesome than those upheld in either *Davis* or *Withrow*. In this case, the Committee ordered bar counsel to conduct an investigation. The Committee then determined probable cause on the basis of evidence submitted by bar counsel. Under *Davis* and *Withrow*, the Committee could have conducted the initial investigation itself, instead of limiting its prehearing role to determining probable cause. Surely, if the Committee could have conducted the initial investigation itself, thus exposing its members to a firsthand look at the evidence, it is permissible for the Committee to play a more limited role by appointing bar counsel to assist it. *See Davis; Withrow.*

### 2. *Specific Objections Alleging Actual Bias or Advocating a Per Se Rule*

*Withrow* and *Davis* recognize, of course, that combining investigative and adjudicative functions in one body creates some potential for prejudgment bias and prejudice. Both cases, however, place the burden on respondents to prove at least a significant likelihood of actual prejudice. "Without a showing to the contrary," we assume that Committee members are " 'capable of judging a particular controversy fairly on the basis of its own circumstances.' " *Withrow*, 421 U.S. at 55, 95 S.Ct. at 1468 (quoting *United States v. Morgan*, 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941)); *accord Davis*, 129 Ariz. at 3, 628 P.2d at 40.

Respondents argue that three of the Committee's actions were sufficiently egregious to demonstrate actual bias or to warrant application of a per se rule: (1) the Committee's agreement to amend the complaint, (2) its ex parte contact with bar counsel at the July 5 meeting, and (3) its agreement to bar discovery of the July 5 meeting on the basis of the attorney-client privilege.

Respondents' first argument does not require extended discussion. Former Rule 33(a)(1) authorized the Committee to bring charges by request of the Commission, this court, or "upon its own motion." Former Rule 34(c) authorized the Committee to amend the complaint "to include further charges, whether occurring before or after the commencement of the disciplinary hearing." *In re Riley*, 142 Ariz. 604, 609, 691 P.2d 695, 700 (1984), upheld this power to amend, "so long as care is taken to assure that the respondent has a reasonable time and an appropriate opportunity to respond to the additional charges. . . ." Here, the complaint was amended at the close of the January session of the disciplinary hearing. Respondents did not have to defend against the additional charge until the March session, at which time respondents' attorneys assured the Committee: "We are prepared to defend against those

two particular cases." Hearing Transcript ("HT") Vol. II (2d Sess.), at 142–43. We hold that respondents had sufficient time to meet the charges.

■ We also are unpersuaded that the July 5 meeting between Committee members and bar counsel violated respondents' due process rights. Respondents rely on *Western Gillette, Inc. v. Arizona Corporation Commission*, 121 Ariz. 541, 592 P.2d 375 (App.1979), but that case does not support their argument. The ex parte contacts in *Western Gillette* took place after an evidentiary hearing, before the commission had ruled on the merits. The attorneys involved in the ex parte communications commented on the evidence and even provided the commission with a proposed form of judgment that later was adopted without notice to the opposing parties. On these facts, the court of appeals correctly held that *"participation in the actual decision making process by only one party to a controversy is inimical to the notions of fairness which underlie the due process of law."* 121 Ariz. at 542, 592 P.2d at 376 (emphasis added).

In the present case, bar counsel did not participate in the actual decision making process. The July 5 meeting concerned probable cause and amendments to the complaint, not the merits of the charges. Furthermore, the July 5 meeting occurred more than six months before the disciplinary hearing began. The broad discovery we allowed respondents to conduct into the nature and content of the July 5 meeting uncovered no hint of unfairness or bias. On these facts, the July 5 meeting is indistinguishable from the ex parte investigations upheld in *Davis* and *Withrow*. We are unwilling to hold that four years of discovery, hearings, and appellate review must be disregarded on the basis of an innocuous one-hour meeting.

■ Furthermore, even if the July 5 meeting had been a technical violation of respondents' procedural due process rights, any error has been cured by our order allowing discovery and by the independent, de novo review conducted by both the Commission and this court. Far more egre-gious ex parte contacts than occurred here have been cured by de novo review or by notifying the opposing party of the contact and then allowing further hearings, discovery, or argument. *See, e.g., McElhanon v. Hing*, 151 Ariz. 386, 728 P.2d 256 (1985) (ex parte contact with judge cured by notice, further argument, and judge's ability to disregard ex parte communication), *cert. denied*, —— U.S. ——, 107 S.Ct. 1956, 95 L.Ed.2d 529 (1987); *State ex rel. Corbin v. Arizona Corporation Commission*, 143 Ariz. 219, 693 P.2d 362 (App.1984) (ex parte contacts between attorney and commission member cured by removing offending officer, reviewing the record, and allowing additional argument and briefing by the parties); *In re Logan*, 71 N.J. 583, 367 A.2d 419 (1976) (prosecutor's participation in disciplinary committee's deliberations cured by de novo review).

■ Finally, respondents argue that bar counsel's initial assertion of the attorney-client privilege to block discovery about the July 5 meeting constituted an independent due process violation. Respondents assert that a per se rule is justified because the Committee "viewed bar counsel as its own lawyer in these proceedings," creating "a relationship of trust and confidentiality" between bar counsel and the Committee "that Zang and Whitmer's attorney could never approach." Respondents' Supplemental Brief, at 6.

Respondents' assertion that bar counsel enjoyed an improper relationship of trust and confidence with the Committee is unsupported by the record. Neither respondents' discovery nor our search of the hearing record revealed any evidence of bias or of a confidential or favored relationship between the Committee and bar counsel. On the contrary, the record reveals a consistent effort by the Committee to be fair and impartial. The Committee ruled against bar counsel on numerous issues, substantive as well as procedural; nothing suggests that the Committee favored bar counsel. As the Committee's investigators, bar counsel communicated to the Committee nothing more than investigative information. As the Committee's counsel, bar

counsel provided nothing more than legal advice on procedural issues, such as amending the complaint. Because the Committee could have acted as its own investigator and advisor and reviewed the same evidence firsthand, *see ante*, bar counsel did not violate due process by communicating the results of its investigation to the Committee. Respondents' due process rights were not violated in this case.[7]

## II. FALSE AND MISLEADING ADVERTISING

### A. *Background*

Zang and Whitmer are charged with false and misleading advertising in violation of DR 2–101(A) and DR 1–102(A)(4), which state, respectively:

(A) A lawyer shall not, on behalf of himself, his partner, associate or any other lawyer affiliated with him or his firm, use or participate in the use of any form of public communication containing a false, fraudulent, misleading, deceptive, self-laudatory or unfair statement or claim.

(A) A lawyer shall not:

\* \* \* \* \* \*

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

This charge is based on four print and nine video advertisements that appeared in Phoenix-area newspapers and on Phoenix-area television stations during 1982 and 1983.

All four print advertisements contained the bold-faced caption **"Law is Civilized Warfare!"** above a picture of Zang and Whitmer and to the left of the following language:

**We're the [or "a"] personal injury law firm:**

\*with the medical experience to understand complicated injuries

\*with investigators to find witnesses and hidden evidence

\*with computers for speed, accuracy and research

**Free Consultation**

No recovery—no attorneys' fee

Each print advertisement also contained a photograph and a statement emphasizing some aspect of respondents' practice. The photographs featured either a judge in a courtroom, a computer circuit board leaning against several books about accident cases and medicine, a large reproduction of a fingerprint, or a woman sitting in a witness box. Beneath one of these photographs, each advertisement featured one of the following statements:

If you're in an accident ... You need a lawyer with facts and know-how, not just words.

**Detailed Preparation**

is part of Zang & Whitmer, Chtd. because: the better your case is *prepared for trial,* the more likely your case will settle out of court without delay or hassles.

(emphasis added).

If you're in an accident ... You need more than a lawyers' [sic] words!

**Medicine and Law**

are combined at Zang & Whitmer, Chtd. because: to prove serious injury and future suffering, your lawyer must have the knowledge to *make complicated medical facts clear for the jury.*

(emphasis added).

If you're hurt in an accident ... You need more than a lawyer's words!

**Licensed Investigators**

are part of Zang & Whitmer, Chtd. because: an investigator searches out witnesses, examines evidence at the accident

---

**7.** We also reject respondents' suggestion that this disciplinary proceeding is improper because it was not prompted by client complaints. Nothing in the record supports respondents' repeated assertions that the complaints against them represent nothing more than harassment by competitors and disgruntled employees. The State Bar received a large number of complaints regarding respondents' advertising and other business practices and acted properly in investigating those complaints. The absence of client complaints does not restrict our authority to impose discipline if ethical violations are established by clear and convincing evidence.

scene, and discovers the facts *essential for victory in the courtroom.*

(emphasis added).

> If you're hurt in an accident ... You need a lawyer with facts and know-how, not just words.
>
> **Evidence**
>
> is part of Zang & Whitmer, Chtd. because: *the defense* will use words and opinions to minimize their fault and your injuries. Only proof of facts will stop them.

(emphasis added).

Like the print advertisements, respondents' television advertisements emphasized the advantages of investigators and medical knowledge. The television advertisements also were very dramatic. They featured an authoritative-sounding narrator and either frenetic or peaceful music as a backdrop for pictures of an automobile accident, a worried couple in a hospital waiting room, or a father kissing his daughter goodbye, apparently for the last time. Each of the television advertisements ended with a climactic scene showing Mr. Zang arguing before a jury in a courtroom, with the viewer visually located behind the jury box.[8]

The Committee and the Commission concluded that respondents' advertisements portrayed respondents as willing and able to take, and as actually taking, personal injury cases to trial. The Committee and the Commission concluded that the advertisements were false and misleading because, in fact, respondents "scrupulously avoided" taking cases to trial. CR, at 11–23; Committee Opinion ("CO"), at 10–16.

**B.** *Discussion*

**1.** *Constitutional Protection*

██ We note at the outset that respondents' advertisements are "commercial speech" protected by the first amendment. *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977).

As respondents candidly acknowledge, however, the proscription of false and misleading advertising in DR 2–101 is constitutionally unobjectionable. *See Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 638, 105 S.Ct. 2265, 2275, 85 L.Ed.2d 652 (1985) (state may "prevent the dissemination of commercial speech that is false, deceptive, or misleading"); *In re R.M.J.,* 455 U.S. 191, 202–03, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982) (same); *Friedman v. Rogers,* 440 U.S. 1, 9–10, 99 S.Ct. 887, 894, 59 L.Ed.2d 100 (1979) (same); *Bates,* 433 U.S. at 383, 97 S.Ct. at 2709 (same); *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771–72, 96 S.Ct. 1817, 1830–31, 48 L.Ed.2d 346 (1976) (same).

"[T]he extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides...." *Zauderer,* 471 U.S. at 651, 105 S.Ct. at 2282; *see also Virginia State Board of Pharmacy,* 425 U.S. at 780–81, 96 S.Ct. at 1834–35 (Stewart, J., concurring). Consequently, false or misleading commercial speech has little or no constitutional value and may be "prohibited entirely." *R.M.J.,* 455 U.S. at 203, 102 S.Ct. at 937. "Indeed, the elimination of false and deceptive claims serves to promote the one facet of commercial ... advertising that warrants First Amendment protection—its contribution to the flow of *accurate and reliable* information *relevant to* public and private *decisionmaking.*" *Virginia State Board of Pharmacy,* 425 U.S. at 781, 96 S.Ct. at 1835 (Stewart, J., concurring) (emphasis added); *cf. Zauderer,* 471 U.S. at 651, 105 S.Ct. at 2282 (state bar may constitutionally require attorneys to include additional information to assure that advertisements are not misleading).

In short, the constitution does not prevent discipline in this case if respondents' advertisements were false and misleading.[9]

---

8. The advertisements did not identify the person arguing to the jury as Mr. Zang. Our decision in this case would be the same if an actor had played Zang's part.

9. Commercial advertising that is truthful and not misleading also may be regulated. But such regulations must be the least restrictive means of directly serving a substantial state interest. *Central Hudson Gas & Electric Corp. v. Public*

We therefore must determine (1) what message respondents' advertisements conveyed, and (2) whether that message was false or inherently misleading.

### 2. *The Message*

The Committee and the Commission found that at least one of the messages conveyed by respondents' advertisements was that the law firm of Zang & Whitmer was willing and able to try, and actually did try, personal injury cases. The Commission concluded that respondents' print advertisements plainly suggest that attorneys at Zang & Whitmer "prepare cases for trial, combine medicine and law to present facts clearly to the jury, do presentations to juries, use investigators to aid in obtaining victory in the courtroom, and prove facts and defeat defenses in court." CR, at 14. In like manner, it found that respondents' television advertisements suggest "that Zang and Whitmer take cases to court and argue before juries." *Id.* at 15. After reviewing the record, we agree that respondents' advertisements would "be interpreted by a reasonable person as representations that Respondents have an unusually high level of expertise and experience in personal injury law, specifically including trial experience." *Id.* at 15–16.

Both the bar and the respondents called advertising and advertising law experts. The experts gave their opinions regarding the message conveyed by respondents' advertisements. With all deference to the experts, and without deprecating or passing upon the admissibility of their opinions, we find no need to rely upon expert testimony to interpret the messages conveyed by the advertisements in evidence. As a matter of common sense, we find that depicting a lawyer trying a case conveys the idea that the lawyer tries cases. When Zang is shown arguing a case to a jury, the message is that Zang argues cases to juries. Accordingly, we hold that one message conveyed by respondents' advertisements was that Zang & Whitmer had tried

personal injury cases in the past and were ready and able to prepare future cases for trial and to try them.

### 3. *Were Respondents' Advertisements Misleading?*

The Committee and the Commission found that respondents' advertisements were false and misleading because they did not accurately portray respondents' practice. Zang & Whitmer was formed in 1979. From that time until the advertisements at issue appeared in 1982 and 1983, no attorney at Zang & Whitmer had tried a personal injury case to a conclusion. HT Vol. IV (2d Sess.), at 265. Zang and Whitmer personally started only one trial, but a mistrial was declared after the first witness testified. *Id.* at 265–67.

Zang, who holds a medical as well as a legal degree, has experience as a medical trial consultant, but has never tried a personal injury case. He conceded that although he felt fully capable of preparing personal injury cases for trial, he is not competent to try a personal injury case. *Id.* at 270; CR, at 22. Whitmer has criminal trial experience, having spent several years with the county attorney's office shortly after he graduated from law school. His only personal injury trial experience, however, consists of three or four trials that occurred more than ten years ago. HT Vol. II (2d Sess.), at 90–91, 155–56.

Most importantly, Zang & Whitmer consciously followed a firm policy of not taking cases to trial. CR, at 16. Respondents believed that pretrial settlements invariably obtained better results for their clients. They settled cases before trial whenever possible. In the few cases where a trial was necessary, respondents' policy was to refer cases to trial lawyers in other firms. *Id.* at 16, 20; CO, at 10–16. Thus, as the Commission concluded, "while [respondents] represented themselves as having the willingness to try cases, they in fact scrupulously avoided" litigation or trial work of any kind. CR, at 22.

*Service Commission*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Because only false and misleading advertising is alleged here, we

do not explore the possibility of regulating truthful advertising.

The evidence clearly demonstrates that respondents did not offer the trial services portrayed in their advertisements. Contrary to their print advertisements, respondents had not and did not prepare cases for trial, "make complicated medical facts clear for the jury," or strive for "victory in the courtroom." Nor did they argue cases in front of juries as their television advertisements suggested. Their intention was to settle all cases. Even if a settlement could not be reached, respondents had no intention of personally taking their clients' cases to trial.

We agree with the Committee and the Commission that respondents' advertisements were false and misleading. When consumers "choose[ ] a lawyer through the advertising process, [they] ha[ve] a right to expect that [their] lawyer will be able and willing to act in the manner represented. In this case, it is clear that respondents had no intention of taking a case personally to trial, and that express and implied representations of their courtroom abilities were false, misleading, and untruthful." CR, at 22–23.

#### 4. *Respondents' Objections*

■ Respondents argue that their advertisements were not false because they accurately suggest only that Zang & Whitmer has an unusually high level of expertise in personal injury law, which occasionally includes trial work. Respondents support this assertion with two pieces of evidence: the expert testimony of Professor Gerald Thain and statistics about the frequency of litigation in personal injury cases.

According to Professor Thain, a law professor specializing in advertising law, respondents' advertisements suggest that Zang & Whitmer will do what is necessary to get the best possible result for its clients, including going to court, if necessary. This suggestion is not misleading, according to Professor Thain, because the

references to trial work add little to the public's *preexisting* perception that all lawyers appear in court. Because the public already incorrectly believes that all lawyers appear in court, consumers will not be misled further by respondents' references to trial work.

Professor Thain's testimony does not aid respondents' cause. As Professor Thain conceded, because respondents personally were unwilling and unable to take cases to court, their advertisements technically were false. Furthermore, that some consumers incorrectly believe that all lawyers routinely appear in court, does not give respondents license to present their practice in a false light. Disciplinary Rule 2–101(A) prohibits false and misleading claims, even if those claims serve only to reinforce consumers' prior misconceptions.[10]

Respondents' second argument is that their advertisements were not misleading because respondents "litigated" as many cases as most other personal injury attorneys and also referred cases to outside trial counsel when necessary. The evidence fails to support these assertions. Expert testimony established that approximately five percent of the personal injury cases *that have been filed* go to trial. *See* HT Vol. III (1st Sess.), at 66; HT Vol. IV (1st Sess.), at 73. Zang testified that Zang & Whitmer filed complaints in only approximately five percent of their cases in 1980. None of those cases actually was tried by anyone from Zang & Whitmer. Indeed, Zang was unable to remember even taking depositions in more than a handful of cases.

There was no expert testimony on the percentage of cases in which lawyers file complaints. However, because most personal injury attorneys actually take five percent of their cases to trial and most cases settle before trial, it is fair to assume that most lawyers file complaints in far more than five percent of their personal

---

**10.** Professor Thain's testimony also is counterintuitive. As Professor Thain conceded on cross-examination, respondents' advertisements are obviously more likely to convey the impression that Zang & Whitmer does trial work than are advertisements which contain no reference to courts, juries, or trials.

injury cases. In this context, Zang's assertion that five percent of respondents' cases were "in litigation" in 1980 does not establish that Zang & Whitmer actually maintained the type of trial practice portrayed in its advertisements. Because ninety-five percent of respondents' cases were not filed, there could have been no discovery, no production of documents, none of the usual preparation for the "civilized warfare" of courtroom confrontation which was the theme of respondents' advertising campaign.

The evidence regarding respondents' referral practice is similarly inadequate. According to Zang, Zang & Whitmer has handled between 1,420 and 1,650 personal injury cases since its formation in 1979. HT Vol. III (2d Sess.), at 32–36. Approximately twenty of those cases were referred to outside trial counsel and approximately nine actually proceeded to trial. Bar Exhibits 73–75, 78; HT Vol. IV (1st Sess.), at 267; HT Vol. II (2d Sess.), at 223. We agree that "[a] practice which refers roughly one percent of all cases to trial counsel [in other firms] is simply too scarce to justify public claims that Zang [and] Whitmer are trial lawyers." State Bar's Opening Brief, at 24. Furthermore, even if respondents' referral practice adequately protected their clients' interests, it did not justify respondents' implicit claims that they would personally represent their clients in court. Indeed, respondents did not even inform new clients that their case would be referred to outside counsel if trial became necessary. CR, at 20–21.

Respondents' final argument is that their advertisements never actually harmed anyone. This argument, inherently difficult to prove or disprove, also is unpersuasive. Although there may be little specific evidence of consumer injury or dissatisfaction,[11] we think it self-evident that the message conveyed by respondents' advertisements was inherently misleading and potentially dangerous. See Zauderer, 471 U.S. at 652–53, 105 S.Ct. at 2283 (advertisement making no distinction between "legal fees" and "costs" is inherently misleading); cf. In re Felmeister & Isaacs, 104 N.J. 515, 518 A.2d 188 (1986) (television advertisements by attorneys using drawings, animations, dramatization, music, or lyrics are inherently misleading; attorney advertising must be predominately informational).

Presumably, respondents included dramatic symbols of conflict—courtrooms, judges, confrontation, and oral argument to a jury—in their advertisements because they believed such symbols would attract clients. Those clients had a right to expect that their attorneys were prepared to take their cases to court and to try them to a judge or jury if necessary. CR, at 21. Not having been told that the firm lacked trial ability, and that it actually prepared cases for settlement, not litigation, a client may have accepted settlement recommendations without determining whether such recommendations were prompted, at least in part, by the firm's lack of in-house trial capacity.

Even if no client has yet been damaged, discipline is appropriate to protect consumers from misleading advertising. The rules governing attorneys are designed to prevent harm and protect consumers. See Ohralik v. Ohio State Bar Association, 436 U.S. 447, 463–64, 98 S.Ct. 1912, 1922–23, 56 L.Ed.2d 444 (1978). Advertisements falsely suggesting a willingness and ability to do trial work necessarily create a danger that consumers will turn to respondents for help with matters that may need to be litigated. This danger alone is sufficient justification for enforcing DR 2–101(A) without requiring proof of actual harm in the past.

Our conclusion that respondents' advertisements were false and misleading should not be read too broadly. Although it seems unlikely that personal injury lawyers can achieve the best results for their clients without earning and maintaining a proven willingness and competence to take cases to trial when necessary, we do not

---

11. There was some testimony suggesting that respondents' reputation of never taking cases to trial resulted in lower settlements for their clients. However, the Commission found the evidence insufficient to establish that respondents failed to adequately protect their clients' interests. CR, at 21.

criticize respondents' practice of settling most cases or of referring trial work to outside counsel. Respondents were not charged with providing incomplete or incompetent legal services, nor was evidence adduced on this point. Thus, it may be, as the evidence at the disciplinary hearing suggested, that respondents' use of computers, investigators, and medical knowledge secured a fair settlement for many of their clients. The same, perhaps, could be said of a competent firm of public adjusters. The fact remains, however, that respondents' advertisements painted a false picture, portraying Zang and Whitmer as trial lawyers who prepared cases for trial, who were willing and able to try, and who actually tried, personal injury cases. That portrait was flattering past the point of deception. *See* DR 2–101(A).[12]

## C. *Directions for the Future*

■ As our prior discussion indicates, we intend strict enforcement of the rule against false and misleading advertising. As a guide for the future, we take this opportunity to outline some principles that may prove helpful in determining whether a particular advertisement is false or misleading. Although the comments that follow pertain to our present rules and are truly dicta in an adjudicatory sense (we cannot fairly evaluate respondents' conduct by standards announced today), they should provide some future direction for the bar.

The Rules of Professional Conduct regulate various aspects of commercial advertisements about a lawyer and his or her services. *See* ER 7.1–7.5, Rule 42, Ariz.R. S.Ct., 17A A.R.S. The only truly substan-

tive regulation, however, is ER 7.1's prohibition of "false or misleading communication[s] about the lawyer or the lawyer's services." According to ER 7.1, an advertisement is false or misleading if it misrepresents or omits a material fact, creates an unjustified expectation about the results a lawyer can achieve, or makes unsubstantiated comparisons of legal services.

Lawyers who choose to advertise should remember that they are professionals charged with an important public trust: preserving and protecting the public's commercial, civil, and constitutional rights. Advertising that informs consumers about their rights and about the availability and cost of legal services is a valuable method of increasing access to legal representation and of furthering the rule of law. This type of advertising is fully deserving of constitutional protection, and is apparently what the Supreme Court had in mind when it extended first amendment protection to lawyer advertising. *See, e.g., Bates, supra.*

We recognize, of course, that another primary purpose of advertising is to convince consumers to call a particular lawyer. While this focus is *not* objectionable standing alone, it often leads attorneys to stretch the truth or to focus on dramatic, "sophisticated" sales techniques that all too often provide little helpful information and consequently have a greater tendency to mislead consumers.[13] While no doubt effective in attracting clients, dramatic, nonfactual advertisements are more likely to misrepresent or omit material facts, or to create unjustified expectations about the results a lawyer can achieve than are advertisements that primarily convey factual

---

**12.** Having found that respondents violated DR 2–101(A), we need not decide whether they also violated DR 1–102(A)(4).

**13.** Consider, for example, the following excerpt from an article by a producer of television advertisements for lawyers:

I have developed the following list of major "don'ts" for the lawyer who wishes to advertise profitably on television. This list will not guarantee that you'll make a fortune. But it will keep you on a safe path in the TV market as it is. Not how it might be. Or should be. Or could be. But how it *is*. And the list

should spare you from becoming ... a target of your ethics committee.

The cardinal rule of lawyer advertising is to never forget that the successful commercial is a sales pitch. Not an announcement. Not a lesson in the law.... It must contain all the elements of any successful sales pitch: attention, interest, desire, conviction and a close (in which you ask the viewer to call).

Landauer, *Dos and Don'ts for Television Commercials*, The National Law Journal, May 25, 1987, at 19.

information that will help consumers make rational decisions about whether to seek legal services.

Thus, attorneys attempting to produce advertisements that are neither false nor misleading should keep in mind that the sale and use of legal services is fundamentally different than the sale and use of ordinary consumer products. *See Felmeister & Isaacs,* 104 N.J. at 537, 518 A.2d at 199. It matters less which brand of beer or soap consumers· choose than what kind of lawyer they choose. Legal representation may affect the consumer's basic rights and may have long-term consequences; consumers easily can discard a disappointing beer or bar of soap and try a different brand next time. Furthermore, consumers are less likely to be "taken in" by advertisements for consumer products than by advertisements for legal services. People usually have much more experience with consumer products than they have with legal services. Consequently, the Rules of Professional Conduct do not tolerate the same sort of sales pitch for legal services that the Federal Trade Commission tolerates for most consumer products.

The dramatic sales pitch is especially troublesome when it is broadcast on radio or television, which leave little time for reflection and rational deliberation. The Iowa and New Jersey Supreme Courts have responded to this potential danger by expanding their rules of professional conduct to require that television advertisements be "predominately informational." *Committee on Professional Ethics & Conduct v. Humphrey,* 377 N.W.2d 643 (Iowa 1985), *appeal dismissed for want of a substantial federal question,* 475 U.S. 1114, 106· S.Ct. 1626, 90 L.Ed.2d 174 (1986); *Felmeister & Isaacs, supra.* Reasoning that dramatic television advertisements are inherently misleading, both courts have severely limited the use of music, pictures, and dramatic presentations in television advertisements by attorneys. Although the Supreme Court has not reviewed either Iowa's or New Jersey's rules, its consistent refusal to explicitly extend its prior holdings to "the electronic broadcast media," *e.g., Bates,* 433 U.S. at 384, 97 S.Ct. at

2709, and its dismissal of the appeal in *Humphrey* for want of a substantial federal question, suggest that even such stringent rules may be constitutional.

Our own rules do not yet place any special restrictions on television or radio broadcasts, nor do we think it necessary to take that step today. Some music or drama may help convey the attorney's message. We believe, however, that lawyer advertising, particularly on the electronic media, should be predominately informational in nature. This is consistent with the rationale for extending first amendment protection to lawyer advertising and with the public's interest in access to and knowledge about lawyers and legal services.

Advertisements are likely to minimize the danger of violating ER 7.1 if they are designed to inform consumers of their rights and of the methods available to meet legal problems and crises; to inform the public of the availability and costs of services; or to convey accurate information relevant to making informed, rational choices of counsel, including information about counsel's availability and areas of practice. *See Felmeister & Isaacs,* 104 N.J. at 525–26, 518 A.2d at 192–93; *Humphrey,* 377 N.W.2d at 647. In the future, the bar should examine lawyers' advertisements to determine whether, taken as a whole, they are predominately informational or are simply emotional, irrational sales pitches. While the latter may not be prohibited by ER 7.1, they should be examined carefully to assure that they are neither false nor misleading.

## III. REPRESENTATIONS OF SOCIETY MEMBERSHIPS

■ Zang also is charged with violating DR 2–101(A) and DR 1–102(A)(4) by claiming the status of "fellow" in the American Academy of Forensic Sciences (AAFS) and the American College of Legal Medicine (ACLM) after his membership in those organizations had been terminated for failure to pay dues. The parties agree that Zang was once a fellow in the AAFS and the

ACLM, that his membership in those organizations terminated in 1977 and 1978 respectively, and that Zang advertised his fellowships in numerous print advertisements and letters from 1980 through 1983. Zang thus concedes, as did his expert, Professor Thain, that his claim of fellowship status was "technically" false.

Before the Committee and the Commission, Zang argued that the letters and advertisements in question were published under the mistaken belief that he was still a dues-paying fellow in both the AAFS and the ACLM. Neither the Committee nor the Commission believed Zang's explanation. CR, at 26–27; CO, at 18–19. Instead, they *unanimously* concluded that "Zang either knew or should have known, or had a duty to apprise himself of his status in each organization, at a time when he was actively producing, editing and reviewing advertisements which would be submitted to the public, and which were intended ... to convey meaningful information to consumers of legal services." CR, at 27; CO, at 19. We agree that the evidence clearly and convincingly supports this conclusion. *Cf. Kersting*, 151 Ariz. at 172, 726 P.2d at 588 (committee findings that turn on credibility are entitled to great weight).

Zang wisely did not press his mistaken-belief argument before this court. Respondents' Brief, at 20–23. Instead, he contends that his claims of fellowship status were "immaterial." Because he maintained the training and education that allowed him to become a fellow in the first place, so the argument goes, consumers were not misled by his failure to disclose his lapse in dues. "Once an Eagle Scout, always an Eagle Scout." Respondents' Brief, at 22.

We are unpersuaded by this argument. Membership in professional societies implies not only the adequacy of past training but a continuing expertise, maintained, at least in part, by active participation in professional functions and education. We recognize, of course, that in many organizations one may maintain membership without active participation. It is undeniably true, however, that by surrendering or al-

lowing his membership to be revoked, Zang put himself in a position where he could not gain the benefits of continuing membership. We therefore disagree with the argument that Zang's misrepresentation of fellowship status was immaterial.

Further, we strongly disagree with the suggestion that the disciplinary rules prohibit only "material" violations that actually harm individual clients. The rules are designed to promote and maintain honesty and integrity. *See* DR 1–102. As the Commission correctly concluded, "It is no defense to the ethical violation of falsehood that ... Zang had not lost" the skills required for initial membership. "The ethical violation lies in [Zang's] willful, knowing or reckless disregard of truth, when making representations to the public, without making any apparent effort to verify the accuracy or currency of [his] information." CR, at 27. Carried to its logical extreme, Zang's argument would allow even those who have never been fellows to claim that status if they could make a colorable argument that they have the skills necessary to become a fellow.

We hold that respondent Zang either knowingly or with reckless disregard of the truth falsely advertised his status as a fellow in the AAFS and in the ACLM. Whatever his qualifications, a lawyer may not knowingly claim membership in an organization to which he does not belong. *Cf.* DR 2–101(B)(13) (lawyer may advertise *membership* in professional societies).

## IV. FAILURE TO SUBROGATE

### A. *Background*

The Committee and the Commission found Zang guilty of unethical conduct for wrongfully settling a property damage claim with two insurers, thereby prejudicing the first insurer's subrogation rights. Zang allegedly violated DR 1–102(A)(4) and (6) and DR 7–102(A)(2), (3), and (7), which provide, respectively:

(A) A lawyer shall not:

\* \* \* \* \* \*

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

\* \* \* \* \* \*

(6) Engage in any other conduct that adversely reflects on his fitness to practice law.

(A) In his representation of a client, a lawyer shall not:

\* \* \* \* \* \*

(2) Knowingly advance a claim or defense that is unwarranted under existing law, except that he may advance such claim or defense if it can be supported by good faith argument for an extension, modification, or reversal of existing law.

(3) Conceal or knowingly fail to disclose that which he is required by law to reveal.

\* \* \* \* \* \*

(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent.

This charge arises out of Zang's representation of Betty Daniels, who retained Zang after she was involved in an automobile accident on April 4, 1981. Zang obtained a settlement draft from State Farm Insurance Company, Daniels's insurer, in payment of medical bills and $1,400 in property damage. He also obtained a $3,900 settlement from Equitable General Insurance Company, the tortfeasor's insurer. The bar alleged that the settlement with Equitable included payment of Daniels's property damage claim, and that Zang refused to honor State Farm's subrogation claim even though he had accepted the Equitable settlement with knowledge that it covered that claim. Zang contended that the settlement with Equitable covered only bodily injury and that he therefore acted properly in refusing to honor State Farm's subrogation claim for the property damage.

The Committee and the Commission rejected Zang's testimony and found that Zang knowingly settled Daniels's property damage claim with Equitable after first having settled the same claim with State Farm. They found that Zang destroyed State Farm's subrogation rights by giving Equitable a release for payment of any and all claims, including "personal injuries and property damages...." They also found that Zang then wrongfully refused to honor State Farm's claim. CR, at 31–33; CO, at 28–31.

Zang objects to the findings of the Committee and the Commission on three grounds. According to Zang, "The evidence totally failed to establish (1) that Equitable made a property damage payment, (2) that if it did [he] knew the payment was for property damage, or (3) that State Farm was injured even if [he] did fail to inform it of the payment." Brief for Respondents, at 24 (numbering added). We examine each of these objections in turn.

### B. Discussion

#### 1. Did the Settlement with Equitable Include Property Damage?

Zang points to two pieces of evidence to support his theory that Equitable's payment did not include property damage. First, Equitable never requested title documents to Daniels's vehicle. This is important, Zang argues, because Equitable had stated in a previous letter that if it paid the property damage claim it would require title documents so that it could obtain the salvage value of Daniels's vehicle. Second, Equitable's settlement check was for a lump sum, and, according to Zang, it was designated "BI," for bodily injury.

Zang's first point is well-taken, but hardly dispositive. Equitable may have decided against obtaining the salvage value, or, more likely, may have failed to request the title documents through clerical or other error. Zang's second claim, that Equitable's check was designated to cover only "BI," is incorrect. In fact, the only notation on the check expressly states that the check was issued "in payment of any and all claims." Furthermore, on July 27, 1981, in exchange for the $3,900 payment, Zang and Daniels signed a waiver releasing Equitable from "any and all ... personal injur[y] and property damage" claims.

Zang did not explain why, if the settlement did not include property damage, neither he nor Equitable crossed out the reference to property damage in Equitable's form release.

Payment for property damage as part of Equitable's $3,900 settlement is further established by internal memoranda from State Farm and Equitable. Several letters indicate State Farm's understanding that the Equitable payment included property damage, and phone memoranda from both State Farm and Equitable establish that Equitable communicated this fact to State Farm. These memoranda do not, of course, go to the question of Zang's knowledge, but coupled with the release and the any-and-all-claims designation on Equitable's check, they leave no doubt that Equitable thought its settlement included property damage.

### 2. *Did Zang Know that Equitable's Settlement Included Property Damage?*

The evidence summarized above also suggests that Zang knew Equitable's settlement included property damage. Zang had negotiated and participated in many similar settlements. It is difficult to believe that he both failed to understand the plain language of the check *and* negligently failed to modify the release.[14] Additional indirect evidence of guilty knowledge is provided by Zang's failure to respond to three letters from State Farm. Those letters requested reimbursement and charged Zang with unethical conduct. Although Zang was not obligated to respond to State Farm's accusatory letters, we believe that few attorneys would silently tolerate repeated attacks on their character if they had acted without knowledge that Equitable's settlement included property damage.

After reviewing the evidence, we find the conclusion reached by the Committee and by the Commission fully supported by the record: "Zang did know that he was set-

tling more than just a bodily injury claim with Equitable[,] and ... by tendering a full release of claims he knew that he was prejudicing State Farm's subrogation right." CR, at 33; CO, at 31. Again, we defer to the Committee and the Commission on questions of credibility. *Kersting, supra.* On the written record, we conclude that the charges were established by clear and convincing evidence.

### 3. *Was State Farm Prejudiced or Injured?*

Evidently conceding that the release he gave Equitable prejudiced State Farm's rights, Zang argues that his actions caused no damage because, fearing that its insured may have been contributorily negligent, State Farm had decided not to pursue its subrogation rights. This argument is deeply flawed. State Farm never informed Zang that it might not pursue subrogation; Zang uncovered this information during discovery for this case. All the information that Zang received immediately before and after the Equitable settlement indicated that State Farm intended to claim subrogation rights. Consequently, State Farm's uncommunicated decision not to subrogate does not excuse Zang's unethical conduct. *See* CR, at 33.

Furthermore, even if State Farm had communicated a decision not to subrogate, at the very least Zang would have been under a duty to inform State Farm that he had obtained a property damage settlement from the adverse carrier. Surely, we are not expected to believe that Zang entertained the belief that, without consideration or reason, State Farm voluntarily would surrender its right to funds that it was entitled to receive under the provisions of its policy. Given Zang's own version of the facts, he was under an obligation to do more than simply pay his client a double recovery on her property damage claim without informing her insurer that there

---

14. Zang's claim that he failed to carefully examine the check and the release is particularly suspect because he was on notice before he accepted settlements from either State Farm or Equitable that State Farm desired to subrogate.

In this situation, it was incumbent upon Zang to assure himself that he was not prejudicing State Farm's rights by releasing Equitable from any and all property damage claims. *See* CR, at 33.

were funds available on its subrogation claim.

## V. WRONGFUL ACCEPTANCE OF A MISTAKEN PAYMENT

### A. *Background*

The Commission also found Zang in violation of DR 1–102(A)(4) and (6) and DR 7–102(A)(2) and (7), *see ante,* for wrongfully accepting settlement money he knew had been tendered in error. This charge arises out of Zang's representation of Rebecca Drummond in a claim for personal injuries.

Drummond was injured in a two-car automobile accident on January 12, 1981. Both Drummond and the driver of the other car, William Bryan, were insured by State Farm Insurance Company. Before Drummond retained Zang, State Farm offered her a $1,100 settlement for the property damage to her vehicle. State Farm twice communicated the same offer to Zang, who apparently never sought a higher amount.

Because State Farm also insured Bryan, Zang's negotiations on the bodily injury portion of Drummond's claim were also with State Farm. Zang initially offered to settle Drummond's bodily injury claim for $8,000. Francene Adcock, the adjustor responsible for Drummond's file, responded with a $2,000 counteroffer. According to Adcock's log, Zang then dropped his offer to $3,500. Adcock responded by coming up to $3,000. A stalemate ensued.

Both parties tried different tactics to end the deadlock. On July 2, 1981, Zang notified Adcock that he had filed suit; he also raised his settlement demand to $6,000. On July 7, Adcock attempted to induce settlement by sending Zang a "drop draft" for $4,500, of which $3,400 covered bodily injury and $1,100 was for property damage. Adcock enclosed a release with the $4,500 draft.

Adcock made the mistaken payment at issue here while she was preparing her $4,500 offer. She reviewed Bryan's file, and, mistakenly thinking she was looking at Drummond's file, wrongly concluded that Drummond's policy included coverage

for medical payments ("med-pay"). Acting on her mistaken belief, Adcock sent Zang a draft for $1,295.05 to cover Drummond's submitted medical bills. Adcock mailed the med-pay draft to Zang on July 6, one day before mailing the $4,500 settlement offer.

Zang thus came into possession of two drafts. The first draft, for $1,295.05, was paid on Drummond's own policy for medical expenses, even though her policy did not include medical coverage. The second draft, for $4,500, was paid on Bryan's policy and included $1,100 for property damage and $3,400 for bodily injury.

Although Zang had never claimed that Drummond was entitled to med-pay coverage, he combined the two drafts to form a $5,795.05 settlement pool. He testified that he initially advised Drummond to reject even this settlement. Eventually, however, Drummond accepted the settlement. Adcock discovered her error on July 28, 1981, and telephoned Zang to return the $1,295.05 med-pay settlement. Zang refused to return the additional money, arguing that it had provided the necessary incentive to settle the case. Zang also rejected State Farm's later offer to return the release signed by Zang and Drummond and to renegotiate or litigate the bodily injury claim. Zang never notified Drummond of the error or revealed to State Farm that he had retained one-third of the mistaken payment as part of his contingent fee.

### B. *Discussion*

The State Bar alleges that Zang presented the med-pay draft to his clients as part of the settlement and took a one-third contingent fee, all with knowledge that the med-pay draft had been tendered in error. Zang's defense before the Committee was that he did not know about the error. Neither the Committee nor the Commission believed him. CR, at 41–42; CO, at 36, 41–42.

The evidence demonstrates that before Zang endorsed the two checks and took his fee on July 23, 1981, he had agreed to settle Drummond's claim for *no more* than $5,100 ($4,000 for bodily injury and $1,100 for property damage). *See* CR, at 36–38

(finding that Zang offered to settle for $3,500). The disparity between this amount and the $5,795.05 he received from State Farm was sufficient to at least alert Zang to the possibility of an error by Adcock.

Zang disputes this conclusion. Relying on a July 2 letter stating that he "remain[ed] willing" to settle for $6,000 after filing suit, Zang claims that he never dropped his offer below $6,000. Once again, the Committee and the Commission did not believe Zang's testimony on this point. CR, at 38, 42; CO, at 39. The record supports their conclusion. First, Adcock testified in her deposition, and recorded in her log, that Zang had offered to settle the bodily injury claim for $3,500 before he filed suit. Significantly, Adcock had no reason to lie in her deposition or to inaccurately record Zang's offer in her log. Second, Zang's July 2 letter was a computer-generated form; consequently, we attach little significance to its use of the term "remain." Third, a July 27 letter from Adcock to Zang reflects Adcock's continued understanding that before filing suit Zang had offered to settle for $3,500, and that Zang had dropped his $6,000 post-filing offer to $4,000. That letter rejects Zang's offer to settle the case for an "additional $500" in consideration for Zang having filed suit. The "additional $500" must be in reference to either Zang's $4,000 offer or to Adcock's $4,500 drop draft. If it was in reference to the $5,795.05 that Zang already had received from State Farm, it would have created a settlement pool *even larger* than the $6,000 Zang claims he requested. *See* CO, at 39.

The disparity between the settlement pool created by combining the two drafts and Zang's prior offers is not the only evidence establishing that Zang must have known the $1,295.05 draft was for med-pay. The face of the med-pay draft clearly identified Drummond's husband as the insured, thus indicating that the payment was for first-party coverage, rather than third-party coverage under Bryan's policy. The draft was payable only to the Drummonds, not to Zang. Furthermore, the med-pay draft was for the unusual amount

of $1,295.05 and was accompanied by a medical payments transmittal form that broke down the amount of the draft by the sums owed to various doctors. The form instructed Zang to disburse the proceeds to the medical providers. In contrast, the $4,500 settlement draft identified Bryan as the insured and was payable to both the Drummonds and Zang. It also was accompanied by a release waiving any claims against Bryan for the "sole consideration of $4,500."

In the face of this evidence, we have no doubt that Zang knew an error had occurred. Zang's testimony before the Committee was internally inconsistent, *see* CR, at 42–43, and was contradicted by overwhelming evidence. Zang's assertion that the $1,295.05 draft was simply "another dirty trick" by Adcock does not excuse his conduct. CR, at 42. Zang's decision "[t]o unhesitatingly and unquestioningly" accept and disburse a settlement larger than he had sought, "creates an impression of the professional attorney as one who can and will take advantage of other persons' errors at all costs...." CR, at 43. Even if Zang initially was unaware of the error, his refusal to take any action after State Farm informed him of its mistake was inexcusable. Zang's refusal to inform his client of the mistaken payment or to return the portion of his fee that was based on the erroneous payment violated DR 1–102(A)(4).

In our view, the evidence clearly and convincingly demonstrates that Zang knew the $1,295.05 had been tendered in error. Zang acted dishonestly when he disbursed the med-pay draft to his clients and took a one-third contingent fee.

## VI. EXCESSIVE FEES

### A. *Background*

The last charge also arises out of Zang's representation of Rebecca Drummond. The Committee and the Commission found that it was improper and unethical for Zang to take a one-third contingent fee out of Drummond's property damage settlement and out of the med-pay money sent to Drummond in error. Zang's actions were

allegedly in violation of DR 2–106, which provides in pertinent part:

(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.

(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent.

B. *Discussion*

The conclusion that Zang & Whitmer collected an excessive fee in the Drummond case follows inescapably from one simple fact: Zang & Whitmer did nothing to earn a fee from either the med-pay or property damage settlements. For the reasons explained in section V, Zang must have known that Adcock's draft was for med-pay and that it had been tendered in error. Zang knew that Drummond did not have med-pay coverage and that he had expended no effort to obtain the med-pay benefits. Consequently, Zang was not entitled to a one-third contingency for "collecting" $1,295.05 in med-pay coverage.

The record also demonstrates that Zang did nothing to justify taking a one-third fee for collecting Drummond's property damage settlement. State Farm had offered Drummond $1,100 on her property damage claim before Zang even entered the case. Zang does not dispute this fact, nor does he claim that Drummond eventually received more than $1,100 for her property damage claim. Instead, Zang argues that he earned his fee by fighting to obtain the $1,100 after Adcock wrongfully withheld it in an attempt to force settlement of the bodily injury claim.

Once again, Zang's testimony is unsupported by the record. State Farm notified Zang of its outstanding $1,100 offer on Drummond's property damage claim on February 9 and on March 30, 1981. The March 30 reminder was in the form of a "claim-gram." It explicitly invited acceptance of State Farm's offer to pay property damage and provided a blank space for Zang's reply. Zang needed only to write his acceptance in the space provided and return the "claim-gram" to State Farm. He never did so. Adcock's log, State Farm's file, and even Zang's file contain *no* evidence that Zang ever attempted to accept State Farm's offer. In these circumstances, Zang should not have taken one-third of Drummond's recovery as his fee.

## VII. DISCIPLINE TO BE IMPOSED

▇▇▇ Respondents Zang and Whitmer violated DR 2–101(A) by engaging in false and misleading advertising. In addition, respondent Zang violated various disciplinary rules by falsely representing himself as a fellow in two professional societies, by failing to honor a subrogation right, by knowingly accepting money tendered to his client in error, and by charging and collecting an excessive fee. The Disciplinary Commission recommended that Zang be suspended for one year and that Whitmer be suspended for ninety days. We turn now to the appropriate discipline.

A. *Restitution*

We have concluded that Zang accepted the sum of $1,295.05 paid by State Farm in

error. *See* section V, *ante*. We also have found that Zang charged an excessive fee to Mrs. Drummond by charging her a contingent fee of one-third on the property damage payment made by State Farm. This fee amounts to $363. The Disciplinary Commission recommended that restitution be required. We think this recommendation is eminently proper. Respondents have not challenged the court's power to require restitution under our former rules. *Cf. In re Beckmann*, 79 N.J. 402, 400 A.2d 792 (1979). It is ordered, therefore, that as a condition of reinstatement Zang and Whitmer, as shareholders of Zang & Whitmer, Chtd., make restitution to Mrs. Drummond in the amount of $363. Respondents are ordered to pay interest on this sum at the rate of ten percent per annum from the date Zang & Whitmer first received the improper payment. In framing the order in these terms, we evince our agreement with the Commission's determination that Whitmer's participation in establishing the firm's fee arrangements was sufficient to justify his participation in the ordered restitution. CR, at 48–49. Respondent Zang also is ordered to make restitution to State Farm in the amount of $1,295.05, with interest at ten percent per annum from the date Zang & Whitmer, Chtd., received the improper payment.

### B. *Suspension*

#### 1. *False and Misleading Advertising*

The Commission recommended a ninety-day suspension for each of the respondents on the charges of false and misleading advertising. In weighing that recommendation, and in determining the proper sanctions to be imposed for the advertising violations, we are mindful that no actual harm to the public was proved. It is our intuitive sense that the type of false and misleading advertising at issue here is likely to damage the public. Our experience leads us to conclude that those who advertise for a high volume, fast turnover litigation clientele, but who have little or no experience or competency in actually trying cases, may do a great deal of damage. First, such practitioners may lack the experience necessary for a proper evaluation of their clients' claims. Next, they may lack the standing and reputation with adverse counsel or insurers that would enable them to realize the full value of their clients' cases in settlement negotiations. Finally, because they lack trial ability, they may be tempted to settle cases that should be tried or, at the very least, to settle them early when settlement at or during trial might produce better results. We do not accept the apocryphal adage that "any settlement is better than trial." Good settlements or reasonable settlements may be better than trial, but one who holds himself out as a specialist in handling cases whose ultimate value can only be determined by trial, ought either to have trial ability or to inform his clients that he lacks it.

These thoughts, however, are products of experience and intuition, and cannot substitute for evidence. The State Bar did not attempt to prove any case in which respondents settled a claim for significantly less than the value which would have been realized by attorneys who properly hold themselves out as specialists in personal injury litigation. Lacking such evidence, and in the absence of any client complaint, we must assume that no harm was done to any client. The record also fails to establish that respondents intended to harm their clients or acted with the knowledge that their conduct would result in harm. We also note that this is a case of first impression. No Arizona lawyers have been disciplined since display and television advertising first were permitted. All of these factors militate in favor of discipline by censure rather than by suspension.

Censure, however, may not be sufficient to deter others in the future. We wish to stress that lawyers will not be permitted to knowingly engage in false advertising or to destroy the ideals of the profession by attempting to snare clients as if they were selling soap rather than providing legal services. Balancing these considerations, we deem it appropriate to suspend each of the respondents for thirty days for engaging in false and misleading advertising.

We believe that given the serious dislocation of their practice, the significant amount of costs that will be charged against them, *see* section VIII, *post,* and the time expended on this case, a thirty-day suspension is sufficient both to ensure that there will be no repetition by respondents and to deter future misconduct by others. Hopefully, there will not be a next time, but if there is, it will not be a case of first impression.

### 2. *Representations of Society Memberships*

The Commission recommended that Zang be suspended for ninety days, the suspension to run concurrent with other discipline imposed in this case, for falsely claiming fellowship status in the AAFS and the ACLM. Zang argues that a ninety-day suspension is unwarranted because he (1) did not willfully misrepresent his fellowship status, and (2) used his best efforts to delete any reference to the fellowships after learning that his memberships had been terminated.

Once again, if the record supported Zang's version of the facts, we might find his argument persuasive. As the Committee and the Commission both concluded, however, at best the record demonstrates that Zang acted with reckless disregard for the accuracy of his claims; at worst, the record demonstrates that he acted willfully, with full knowledge that his memberships had lapsed and that his fellowships had been terminated. CR, at 26–27; CO, at 18–19. Like the Committee and the Commission, we find Zang's testimony regarding these charges inconsistent and unpersuasive. Zang's claim that he used his best efforts to eliminate all references to his fellowships, for example, is undercut by the record. Bar Exhibit 86 establishes that Zang & Whitmer mailed nine letters that included claims of fellowship status after Zang had been notified that his fellowship status had been terminated. Zang personally signed three of those letters. *See* HT Vol. V (2d Sess.), at 88–96.

We approve the Commission's recommendation that Zang be suspended for ninety days. The suspension will run concurrently with other discipline imposed in this case.

### 3. *Failure to Subrogate*

Zang violated DR 1–102(A)(4) and (6) and DR 7–102(A)(2), (3), and (7) by knowingly "assist[ing Ms. Daniels] in collecting twice for the same property damage," and by "refus[ing], on behalf of his client, to entertain any effort to reimburse State Farm...." CR, at 33. The purposeful nature of Zang's actions warrants the ninety-day suspension recommended by the Commission. CR, at 34. This ninety-day suspension will run concurrently with other discipline imposed in this case.

### 4. *Wrongful Acceptance of a Mistaken Payment*

Zang's decision to accept and disburse money he must have known had been tendered in error, and to take a fee for his "efforts," is precisely the type of dishonest, fraudulent conduct proscribed by DR 1–102(A)(4). His dishonest conduct reflects adversely on his fitness to practice law, DR 1–102(A)(6), and was in violation of DR 7–102(A)(2) and (7). The Commission recommended that Zang be suspended for one year on this charge.

A majority of this court believes that the recommended discipline is appropriate. In part, they base this conclusion on Zang's lack of candor at the Committee hearing. Lack of candor is a recognized factor in determining the nature of discipline to be imposed. American Bar Association, Standards for Imposing Lawyer Sanctions, Rules 9.1 and 9.2 (1986). The court therefore imposes a suspension of one year, to run concurrently with all other suspensions imposed in this case. The writer and Justice Holohan favor a lesser discipline.[15]

---

**15.** Given the administrative difficulty of reinstatement resulting from suspension for a period in excess of six months (*see* former Rule 41(a) through (k), and present Rule 71, especially subsections (c) and (g)), Justice Holohan and I believe this recommendation somewhat harsh. The impropriety of Zang's acceptance of sums paid by mistake is not significantly differ-

### 5. *Excessive Fees*

Zang's fee in the Drummond case clearly was excessive under the standards set out in DR 2-106. *See* section VI, *ante.* The Commission recommended that Zang be suspended for ninety days. We do not believe that a ninety-day suspension is warranted for charging a fee excessive by $363. However, some suspension is certainly warranted, considering the nature of the impropriety. We therefore impose a suspension of thirty days, to run concurrently with all other suspensions imposed in this case.

## VIII. CONCLUSION

We hold that respondents received a fair hearing before an impartial tribunal. In our view, the due process standards articulated in *Withrow* and *Davis* were satisfied in this case. Even if they were not satisfied, however, any violation was cured by the de novo review conducted by the Commission and this court.

For the reasons discussed in this opinion, Stephen M. Zang is suspended from the practice of law for one year, commencing on the date of the mandate in this case. As a condition of reinstatement, he is required to make restitution to State Farm and to Rebecca Drummond as specified in section VII-A. Pursuant to former Rule 37(g), Mr. Zang is ordered to pay the State Bar of Arizona $15,441.06 for costs and expenses incurred in prosecuting this action.

C. Peter Whitmer is suspended for thirty days, commencing on the date of the mandate in this case, for engaging in false and misleading advertising. *See* section II, *ante.* As a condition of reinstatement, he is ordered to make restitution to Rebecca Drummond as provided in section VII-A. Pursuant to former Rule 37(g), Mr. Whitmer is ordered to pay the State Bar $11,-166.97 for costs and expenses.

ent in quality from his refusal to honor State Farm's subrogation claim in the Daniels case. While the purposeful nature of Zang's actions in both cases warrants suspension rather than censure, we do not believe it warrants suspension for any longer period. However, we do believe that discipline imposed on two unrelated ac-

GORDON, C.J., and CAMERON, HOLOHAN and HAYS (Retired), JJ., concur.

MOELLER, J., did not participate in the determination of this matter.

HAYS, J., (Retired) was called back to active duty pursuant to Ariz. Const. art. 6, § 20.

tions of dishonest or fraudulent conduct should be imposed consecutively. We, therefore, would suspend Zang for ninety days for wrongfully accepting funds tendered in error and order that this suspension run consecutively with all other discipline imposed in this case.