James Scott **FARRIN**, Michael Lewis, David D. Daggett, Market Masters, Legal, a Resonance Company, Inc., Plaintiffs,

v.

Cressie H. **THIGPEN**, Jr., President of the North Carolina State Bar, Ann Reed, President–Elect of the North Carolina State Bar, E. Fitzgerald Parnell, III, Vice–President of the North Carolina State Bar, Robert C. Sink, Past President of the North Carolina State Bar, Steven D. Michael, Charles W. Ogletree, Mark W. Owens, Jr., David A. Stoller, John R. Parker, Jr., Councilors, Robert W. Johnson, Cary Whitaker, William H. "Buddy" Jones, Jr., Henry C. Babb, B. Geoffrey Hulse, Julius E. Banzet, III, George B. Daniel, Barbara B. Weyher, James K. Dorsett, III, Howard P. Satisky, John B. McMillan, C. Colon Willoughby, Jr., N. Hunter Wyche, Jr., Maria M. Lynch, Robert A. Spence, Jr., H. Gerald Beaver, H. Clifton Hester, N. Joanne Foil, Robert O. Belo, Charles E. Davis, Lunsford Long, Daniel B. Dean, John Breckenridge Regan, III, Kenneth D. Knight, Carroll F. Gardner, Betty J. Pearce, William O.

---

428

Cooke, Jr., Jan H. Samet, Samuel F. Davis, Jr., Richard G. Roose, John L. Holshouser, Jr., Fred D. Poisson, Sr., Dudley Humphrey, Roy G. Hall, Jr., Richard V. Bennett, Gary W. Thomas, Dennis R. Joyce, Garrett D. Bailey, H. Houston Groome, Jr., J. Michael Booe, Nelson M. Casstevens, Jr., Marylaurel E. Wilks, Samuel M. Millette, Calvin E. Murphy, Irwin W. "Hank" Hankins, III, Edward T. Hinson, Jr., Jim R. Funderburk, Don M. Pendleton, Sara Davis, Sharon Alexander, Robert F. "Bud" Siler, Aurelia W. Erwin, Hermon F. Fox, Terry E. Garrison, Members of the North Carolina State Bar Council, Defendants.

No. 00CV1122.

United States District Court,
M.D. North Carolina.

July 19, 2001.

Order Amending in Part Findings of Fact and Conclusions of Law August 16, 2001.

Harrell Hugh Stevens, Jr., Everett, Gaskins, Hancock & Stevens, Raleigh, NC, Harrell Hugh Stevens, David B. Freed-

man, White and Crumpler, Winston-Salem, NC, for Plaintiffs.

Norma S. Harrell, N.C. Dept. of Justice, Raleigh, NC, Thomas F. Moffitt, N.C. Dept. of Justice Special Deputy Atty. General, Raleigh, NC, Aldert Root Edmonson, N.C. State Bar, Raleigh, NC, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

OSTEEN, District Judge.

This case was brought by Plaintiffs James Scott Farrin (Farrin), Michael Lewis (Lewis), David D. Daggett (Daggett), and Market Masters—Legal, a Resonance Company, Inc. (Market Masters) to challenge on First Amendment grounds 2000 Formal Ethics Opinion 6 (2000 FEO 6) adopted by the North Carolina State Bar (State Bar). The State Bar determined that a specific television ad run by Plaintiffs, the "Strategy Session," was misleading and created unjustified expectations in violation of Rule 7.1 of the Revised Rules of Professional Conduct (the Revised Rules). Defendants are members or former members of the North Carolina State Bar Council (the Council) who adopted 2000 FEO 6. A bench trial was conducted from April 16 through April 18, 2001, from which the court makes the following findings of fact and conclusions of law. In determining whether 2000 FEO 6 survives First Amendment scrutiny, the court must apply the well developing body of law addressing lawyer advertising to a relatively new form, the dramatic vignette. .

## FINDINGS OF FACT

A. *The Parties*

1. Farrin is a citizen and resident of Durham, North Carolina. He is a licensed attorney who is a member of the State Bar and practices law in Durham as "The Law Offices of James Scott Farrin, P.C."

2. Lewis and Daggett are citizens and residents of Forsyth County, North Carolina. They are licensed attorneys who are members of the State Bar and practice law in Winston–Salem as "Lewis & Daggett, Attorneys at Law, P.A."

3. Market Masters is incorporated pursuant to Massachusetts law with its principal place of business in that state. Market Masters produces and distributes marketing, promotional, and advertising materials for attorneys, including ads for use on television broadcast and cable outlets. One such television ad is "Strategy Session," which is designed for use by attorneys whose practices consist primarily of representing plaintiffs in personal injury cases.

4. Each of the defendants is a member or former member of the Council, a North Carolina agency created and existing pursuant to Article 4 of Chapter 84 of the North Carolina General Statutes. The Council is composed of 55 lawyers, three public members, and five officers. Each member of the Council is either a member of the Ethics Committee or the Grievance Committee.

5. Members of the Council collectively constitute the governing body of the State Bar, and in their official capacities, are vested by the General Assembly with authority to regulate the professional conduct of persons licensed to practice law in North Carolina, including the authority to formulate, adopt, and enforce the Revised Rules.

B. *Background*

6. In August 1998, Lewis and Daggett contracted with Market Masters to use the "Strategy Session" in conjunction with two other ads in the Greensboro/Winston–Salem television market.

7. Early in August 1998, Lewis conferred by telephone with Alice Neece Mine (Mine), assistant executive director of the State Bar, about the three proposed television ads. Lewis asked Mine to provide him with an informal opinion as to whether the ads complied with the Revised Rules. He also submitted the text of the ads to Mine.

8. The Ethics Committee of the State Bar and designated State Bar staff attorneys, including Mine, issue three kinds of written opinions in response to lawyer inquiries: (1) formal ethics opinions, which are published for public comment in the State Bar *Journal;* (2) ethics decisions, which are unpublished opinions of the Ethics Committee and are directed only to the inquiring lawyer; and (3) ethics advisories issued by designated staff counsel of the State Bar to inquiring lawyers concerning their own contemplated conduct. Designated State Bar staff counsel, such as Mine, also provide informal oral opinions that concern a lawyer's own actual or contemplated conduct in response to telephone inquiries.

9. On August 11, 1998, Mine told Lewis that she was unable to give him an informal opinion because she was of the opinion that the "Strategy Session" ad fell into a "grey area" and thus she could not tell him unequivocally whether it did or did not comply with the requirements of Rule 7.1. Mine expressed concern that the ad was misleading because it appeared to create an unjustified expectation about the results that he might be able to obtain for potential clients.

10. On August 14, 1998, Lewis told Mine that he would air the ad with a disclaimer indicating that no specific results were implied. On August 19, 1998, Mine received a facsimile letter from Lewis with a revised script, including the disclaimer. She returned a facsimile copy of the letter to Lewis with a handwritten note stating that the script was "approved with disclaimers."

11. After receiving Mine's informal opinion that the addition of the disclaimer satisfied Rule 7.1, Lewis and Daggett aired the "Strategy Session" ad approximately 2,900 times in the Greensboro/Winston–Salem market on five television stations.

12. In October 1998, the 21st Judicial District Bar, a subdivision of the State Bar, received a written inquiry from Brian J. Chapuran (Chapuran), a student at the Wake Forest University School of Law, asking whether the "Strategy Session" ad constituted a violation of Rule 7.1. On October 20, 1998, the executive director of the 21st Judicial District forwarded Chapuran's inquiry to the State Bar with notice to Lewis and Daggett, but the State Bar did not open a formal grievance file based on Chapuran's letter.

13. In May 1999, the State Bar received a formal grievance about the "Strategy Session" ad from two licensed attorneys who are members of the State Bar. The State Bar

then opened a file on the grievance, referred it to the Grievance Committee, and sent Lewis a "Letter of Notice." Lewis and Daggett notified the State Bar that they voluntarily had suspended use of the ad on August 10, 1999, after being notified by the State Bar that a formal grievance had been initiated against Lewis concerning the airing of the ad.

14. On October 11, 1999, Farrin's counsel submitted scripts for two proposed ads to Mine, including a version of the "Strategy Session" ad essentially identical to the ad submitted by Lewis. Mine responded in writing on October 15, 1999, that she was not comfortable giving Farrin an advisory opinion because the two ads raised the same issue that was the subject of the Lewis grievance. She advised Farrin's counsel that prior approval was not required, so he could run the ad if he desired.

15. On February 7, 2000, Farrin began airing the "Strategy Session" in the Raleigh/Durham television market. He aired the ad approximately 8,500 times on six channels.

C. *2000 Formal Ethics Opinion 6*

16. In January 2000, the Grievance Committee directed the State Bar staff to submit a hypothetical inquiry incorporating the script to the Ethics Committee, deferring action on the Lewis grievance until the Ethics Committee issued a response. At the direction of the Ethics Committee, Mine prepared a draft opinion concluding that the hypothetical ad did not violate Rule 7.1. The draft was presented to the Ethics Committee at its April 13, 2000, meeting. After reviewing the ad and considering oral and written presentations, the Ethics Committee voted to render an opinion that the ad was misleading in violation of Rule 7.1 and instructed a subcommittee to draft an opinion accordingly.

17. Rule 7.1, addressing communications concerning a lawyer's services, states:

A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it:

(a) contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading;

(b) is likely to create an unjustified expectation about the results the lawyer can achieve, or states or implies that the lawyer can achieve results by means that violate the Rules of Professional Conduct or other law; or

(c) compares the lawyer's services with other lawyer's services unless the comparison can be factually substantiated.

18. The subcommittee of the Ethics Committee met on May 26 and July 13, 2000, and drafted Proposed 2000 Formal Ethics Opinion 6 (Proposed FEO 6), which the Ethics Committee on July 19, 2000, voted unanimously to publish for public comment. Proposed FEO 6 was published in the Fall 2000 edition of the State Bar *Journal*. On September 7, 2000, Lewis, Daggett, and Farrin submitted comments in opposition to the adoption of Proposed FEO 6 and asked that it be withdrawn. After considering public comments and presentations by Plaintiffs and their counsel, the Ethics Committee, by divided vote,

voted at its October 18, 2000, meeting to recommend that the State Bar adopt Proposed FEO 6 as published.

19. The Ethics Committee also recommended that the Grievance Committee dismiss the grievance against Lewis because he had sought an informal ethics advisory opinion from the State Bar staff and had been advised that the "Strategy Session" ad, with some amendments and a disclaimer, would comply with Rule 7.1. On January 24, 2001, the Grievance Committee dismissed the grievance against Lewis.

20. Proposed FEO 6 included the script from the "Strategy Session" followed by two questions: "Does the advertisement comply with the Revised Rules of Professional Conduct? Is the advertisement misleading?" Proposed FEO 6 concluded:

The advertisement in this inquiry intentionally creates the impression that the insurance company, and its lawyers, are anxious to settle a claim brought by Lawyer A solely because of his reputation. It implies that the decision to settle the claim is based upon the representation of the claimant by Lawyer A without regard for the strength of the claim or the evidence. Thus, the commercial is likely to create an unjustified expectation about results that the lawyer can achieve. Also, it misrepresents the importance of the myriad of factors that are taken into consideration by an insurance company, or its lawyers, when deciding whether and for how much a claim should be settled. Therefore, the advertisement does not comply with the Revised Rules of Professional Conduct.

21. On October 20, 2000, the Council adopted, by divided vote, Proposed FEO 6, as published, which then became 2000 FEO 6. By adopting 2000 FEO 6, the State Bar Council rendered its official position that airing of the "Strategy Session" ad by any member of the State Bar would constitute a violation of Rule 7.1, thereby exposing any attorney airing the ad to disciplinary procedures.

22. The State Bar notified Farrin on October 26, 2000, that 2000 FEO 6 had been adopted. On November 20, 2000, he notified the State Bar that he had suspended use of the "Strategy Session" ad in North Carolina on October 20, 2000, the day that 2000 FEO 6 was adopted.

D. *The "Strategy Session" Ad*

23. The "Strategy Session" is composed of two parts, which together last 30 seconds. The version used by Farrin is substantially similar to the one used by Lewis and Daggett. The first part is a black and white vignette featuring a group of insurance adjusters discussing a claim arising from a car accident.[1]

---

1. The written script of the Lewis & Daggett ad submitted to the State Bar's Ethics Committee identifies the two speaking actors as "junior lawyer" and "senior lawyer." However, the ad that ran on television for Farrin begins with the text "Insurance adjusters strategy session" superimposed over the image of several people sitting in a conference room, and the television ad for Lewis & Daggett includes similarly placed text stating "Legal strategy session: insurance company." The court finds that it is irrelevant whether the individuals are portrayed as lawyers or insurance agents for purposes of determining whether the ad is inherently misleading. Therefore, the court will simply refer to the individuals as the "senior man" and the "junior man."

The second part features an actor spokesperson, Robert Vaughn (Vaughn).

24. The ad depicts a scene, which is viewed through blinds as if the viewer were looking into a window, which takes place in a conference room where three people, a woman and two men, are seated at a table. A fourth man dressed in a business suit, the "senior man," the oldest person in the room, is seated on the edge of a credenza facing one of the men at the table, the "junior man," who is coatless. There is a book or binder open in front of the junior man, and he is leaning back and turned to face the senior man. The other two individuals, both dressed in business suits, have their backs to the camera for the duration of the vignette and have no apparent role other than to listen to the junior man and senior man converse. In the background there is a large pad resting on an easel; a list is visible on it, but due to the short time it is displayed and its small print, it is not possible to discern the contents of the list.[2]

25. The vignette opens on that scene with a box of text (white type against a black background) superimposed that either states "Insurance adjusters strategy session" or "Legal strategy session: insurance company," depending on whether it is Farrin's or Lewis and Daggett's ad. Beneath the box in much smaller, white letters imposed on the scene itself rather than in a black box appears the following disclaimer: "Dramatization by actors. No specific result implied. Vaughn is a paid spokesperson for The Law Office of James Scott Farrin. ©2000 Market Masters–Legal, A Resonance Co., Inc."[3] Daggett testified that the disclaimer for both ads was on the screen approximately four seconds.

26. The camera focuses on the senior man alone, who asks the junior man, "How do you suggest we handle *this* claim?" The camera then pans to the junior man, who leans back slightly in his seat and replies, "It's a large claim, a serious auto accident. We could try to deny it or delay, see if they'll crack."

---

**2.** Daggett testified that the list included the phrases "Auto Accident Claims, Medical Bills, Pain and Suffering, Economic Damages, and Value of Claim." At best, when the videotape is paused on that frame on a large enough screen, it is possible to make out the first three phrases, but not "Economic Damages" and "Value of Claim." However, at the speed at which the ad runs, it would be very difficult to ascertain any of the phrases unless an individual focused on reading the list. Daggett testified that the point of the list was to indicate that the ad begins in the middle of the conference and that the words were not necessarily important. Regardless of the list, it is clear that the meeting had already begun; however, the particular claim discussed is raised when the vignette begins. The court will not attribute any significance to the list other than to find that it indicates that at some point, not necessarily during the meeting, someone wrote on the pad. Its contents lend nothing to the question of whether the ad is misleading.

**3.** The Lewis and Daggett ad contained a disclaimer of similar size and duration that stated, "Dramatization by actors. No specific result implied." The court notes that the disclaimers were so small and displayed for such a short time that one would need to view the ad many times to read the words. Nevertheless, the court finds that the size and display time of the disclaimer are not material to its decision here.

27. The camera returns to the senior man's face, as he asks in a slower, more deliberate tone, "Who's the lawyer representing the victim?" As the senior man is speaking, the camera returns to a close-up of the junior man, who frowns slightly with a reluctant expression. The camera again focuses on the senior man's face, his expression calm and his eyes looking downward as he awaits the answer. While the camera is on the senior man's face, the junior man's voice is heard saying slowly, "Lewis and Daggett." [4]

28. The pace of the remainder of the vignette speeds up. A loud, metallic gong sounds immediately after the name of the firm is stated. Upon hearing the name, while the gong is sounding, the senior man's expression changes dramatically. His eyebrows shoot up and his eyes widen and shift from downward toward the junior man. The court finds that the senior man's expression would be characterized by a reasonable person as dismayed or alarmed.[5] The camera returns to the junior man's face, while the senior man exclaims the name of the firm as a question, "Lewis and Daggett?" The junior man nods, his mouth in a grim line. The vignette ends with the camera back on the senior man's face as he says, "Let's settle this one." His mouth is also set into a grim line, and he looks away from the junior man and downward.

29. The camera then moves away to the second part featuring Vaughn, who looks into the camera in the direction of the viewer and says, "North Carolina insurance companies know the name Lewis and Daggett. If you've been injured in an auto accident, tell them *you mean business.*—Call Lewis and Daggett. 1–800–LAW–7777 right now." Vaughn points at the screen while he emphasizes the italicized words.

30. The "Strategy Session" is not an accurate portrayal of the method employed by insurance adjusters or defense attorneys in determining whether to settle a case.

## DISCUSSION

■ The Supreme Court has held that the First Amendment does not protect commercial speech that is false, deceptive, or misleading. *See Virginia Pharmacy Bd. v. Virginia Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Commercial speech that is not false or deceptive and does not concern unlawful activities, however, may be restricted only in the service of a substantial government interest, and only through means that directly advance that interest. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.,* 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980). Plaintiffs and Defendants agree that the court's determination of whether the ad is inherently misleading will determine which party prevails. The

---

4. The script for the vignette is identical, except that the junior man and senior man replace "Lewis and Daggett" with "James Scott Farrin."

5. The court has chosen these descriptive words after consultation with *Webster's Third*

*New International Dictionary* (1986), which defines "dismay" as "to take away the courage or resolution of with alarm or fear" and "alarm" as "apprehension of an unfavorable outcome, of failure, or of dangerous consequences."

parties differ, however, on the method by which ·the court may determine whether the "Strategy Session" ad is inherently misleading. Plaintiffs argue that the court cannot find the ad inherently misleading because Defendants failed to produce any studies showing the actual effects of the ad on consumers. Defendants argue, on the other hand, that the court need only view the ad to determine that it is inherently misleading.

Many states placed an absolute prohibition on lawyer advertising until the Supreme Court decided *Bates v. State Bar of Ariz.*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), holding that such advertising may be regulated, but it may not be subjected to blanket suppression. The Court's decision in *Bates* was a narrow one, permitting lawyers to advertise the fees they charge for certain routine legal services. The Court recognized that advertising by professionals poses special risks of deception—"because the public lacks sophistication concerning legal services, misstatements that might be overlooked or deemed unimportant in other advertising may be found quite inappropriate in legal advertising." *Bates*, 433 U.S. at 383, 97 S.Ct. at 2708. In a subsequent case, the Supreme Court stated that "[t]he public's comparative lack of knowledge, the limited ability of the professions to police themselves, and the absence of any standardization in the 'product' renders advertising for professional services especially susceptible to abuses that the States have a legitimate interest in controlling." *In re R.M.J.*, 455 U.S. 191, 202, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982).

■ Given the unique nature of professional services, the Supreme Court held that regulation and imposition of discipline are "permissible where the particular advertising is inherently likely to deceive *or* where the record indicates that a particular form or method of advertising has in fact been deceptive." *Id.* (emphasis added). Defendants in this case contend that the "Strategy Session" is inherently likely to deceive by misleading the public. Plaintiffs, on the other hand, contend that the ad is not inherently misleading and that Defendants have failed to show actual deception. The court is faced with an individualized finding that the particular ad is inherently misleading rather than a prophylactic ban on a particular form of advertising, as addressed in *R.M.J.* The Supreme Court has held that "when the particular content or method of the advertising suggests that *the advertising* is inherently misleading *or* when experience has proved that in fact such advertising is subject to abuse, the States may impose appropriate restrictions." [6] *R.M.J.*, 455 U.S. at 203, 102 S.Ct. at 937 (emphasis added). Thus, false or misleading ads may be prohibited entirely, but states may not absolutely prohibit certain types of truthful but potentially misleading information. *See id.*

In determining whether truthful advertising related to lawful activities is nonetheless misleading, the Supreme Court has held that a state need not "conduct a survey of the ... public before it [may] determine that the [advertisement] had a tendency to mislead" when "the possibility of

---

**6.** Though the Supreme Court in *In re R.M.J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982), does not specify whether it is referring to truthful advertising related to lawful activities or all advertising, the sentence preceding the above quote states, "Truthful advertising related to lawful activi- ties is entitled to the protections of the First Amendment." *Id.* Hence, it appears from the context that the court is referring to truthful advertising rather than all advertising when it refers to the italicized text. Regardless, the test would apply to false advertising, as well.

deception is as self-evident as it is in this case." *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio,* 471 U.S. 626, 652, 105 S.Ct. 2265, 2282, 85 L.Ed.2d 652 (1985) (citation omitted). The Court affirmed the Ohio Supreme Court's finding that the appellant's ad, which stated that "if there is no recovery, no legal fees are owed by our clients," was misleading on its face because members of the public would not be aware of the distinction between legal fees and legal costs. *Id.* Unlike the ad in question here, which deals with an implied message, the Supreme Court in *Zauderer* was dealing with a statement that was true on its face but nonetheless misleading.

The court is presented with the issue of whether an implied message should be analyzed under the same rubric as an explicit statement made in an ad. Supreme Court precedent deals with explicit statements that were subject to verification, whereas the "Strategy Session" conveys its message through a fictional scene. Defendants argue that the ad nevertheless is inherently misleading and therefore outside the protective net of the First Amendment. It is not only the statements made in the vignette that were found inherently misleading by the State Bar but the "statement" made by the actors' expressions, the dialogue, and the outcome.[7]

■ Plaintiffs argue that the State Bar failed to sustain its burden of proof because it did not submit any evidence that actual consumers had either complained about the "Strategy Session" ad or been harmed by it. The case law, however, plainly states that such evidence is only required where the ad at issue contains a truthful statement that is nonetheless mis-

leading and is not required where the ad is inherently misleading. *See, e.g., Zauderer,* 471 U.S. at 652, 105 S.Ct. at 2282; *Langlitz v. Board of Registration of Chiropractors,* 396 Mass. 374, 486 N.E.2d 48, 53 (1985) (holding that it was not necessary to show resulting harm to the public because "[t]he board's determination that the advertisement was inherently misleading was a matter of common experience and common sense, based on the appearance and content of the advertisement itself"); *In the Matter of Zang,* 154 Ariz. 134, 741 P.2d 267 (1987) (en banc) (holding that no expert testimony was needed to interpret the messages conveyed by the ad because the court could rely on common sense). *Compare with Capoccia v. Committee on Prof'l Standards,* No. 89–CV–866, 1990 WL 211189 (N.D.N.Y. Dec. 20, 1990), at *5–6 (holding that the statement "If you've been injured you deserve a fast fair cash compensation" was not inherently misleading because it was true, given that New York had an insurance system where compensation was to be paid promptly and without regard to the driver's fault and that the state bar failed to show a substantial government interest under *Central Hudson* ).

The "Strategy Session" does not contain a truthful statement that is being challenged as misleading; rather, it consists of a fictional meeting of insurance adjusters whose dialogue leads to a decision to settle the case after learning the identity of the plaintiff's attorneys. The court finds that the State Bar was not required to conduct a public survey to determine that the "Strategy Session" is misleading because the ad contains a self-evident message. Plaintiffs argue that the ad's message varies depending on the eye of the beholder,

---

7. Alice Mine initially expressed concern that the statement made by Vaughn that "North Carolina insurance companies know the name Lewis & Daggett" violated Rule 7.1, but she was persuaded otherwise by a list of insurance companies that had interacted with Lewis and Daggett. That statement is not the subject of 2000 FEO 6.

which would essentially allow advertisers to depict any fictional scene so long as the script itself made no false explicit claim about the lawyer. However, the court is not required to employ a stricter evidentiary standard when dealing with a fictional vignette than required by the Supreme Court in dealing with a factually true statement. Thus, the court need not consider extrinsic evidence to determine whether the ad is misleading.

Plaintiffs argue that *Mason v. Florida Bar*, 208 F.3d 952 (11th Cir.2000) is "very much parallel to this case in terms of the issues" and requires a showing of an actual effect on consumers. (Trial Tr., Vol. II, at 213.) However, Plaintiffs failed to acknowledge a key distinction—the court in *Mason* determined from the outset that the appellant's speech was truthful information and therefore analyzed the state bar's decision under the *Central Hudson* test.[8] Further, the ad at issue in *Mason* stated that Mason was " 'AV' Rated, the Highest Rating Martindale–Hubbell National Law Directory," which the bar found was in violation of a prohibition against self-laudatory statements by attorneys. The Eleventh Circuit found that, though the state bar had asserted two substantial interests in the abstract, an interest in ensuring that attorney ads are not misleading and that the public has access to relevant information to assist in the selection and comparison of attorneys, its restrictions on Mason's speech did not necessarily serve those interests. *See id.* at 956.

The Eleventh Circuit reversed the district court's finding that the ad was misleading because the state bar only objected to the description of the AV rating as the highest and not to the mention of the rating itself, the description was accurate, and the district court made no finding that any person had been misled by the statement. The Eleventh Circuit stated that "[u]nfamiliarity is not synonymous with misinformation," and therefore the public's unfamiliarity with the ratings system alone did not justify the imposition of a disclaimer requirement on the ad. *Id.* at 957.

The present case is readily distinguished from *Mason*. First, it does not involve commercial speech protected by the First Amendment because the vignette is fictional and does not contain truthful statements. As repeatedly stated by the Supreme Court, false or misleading speech is not commercial speech protected by the First Amendment. Therefore, the consideration of the state's justifications in relation to the restrictions placed on commercial speech employed in *Mason* is irrelevant to the court's analysis here. Second, unlike an ad involving a rating system unfamiliar to the general public but correctly represented, the "Strategy Session" involves a portrayal of insurance industry practices that is not accurate, as discussed further below.

Plaintiffs urge the court to analyze this case under principles taken from decisions of the Federal Trade Commission (FTC) with regard to consumer advertising. They argue that the court should analyze the "Strategy Session" ad under a "reasonable consumer" standard. Plaintiffs contend that the ad cannot be inherently misleading if reasonable minds can differ as to whether the ad is misleading; hence, because Mine approved the ad and 2000 FEO 6 was adopted after a split vote, the ad cannot be inherently misleading. Under

---

**8.** For the same reason, *Revo v. Disciplinary Bd. of the Supreme Ct. for New Mexico,* 106 F.3d 929 (10th Cir.1997), does not provide the applicable standard. The court found that the solicitation letter in *Revo* was truthful on its face and therefore required application of the *Central Hudson* test, whereas this court is dealing with a fictional ad.

Plaintiffs' logic, all ads would be immune from challenge as long as they were subject to more than one interpretation. This argument contains an obvious fallacy, as it would have the effect of trussing a court's ability to rule on virtually any matter on which there was not unanimous agreement. In addition, Supreme Court precedent clearly leaves the determination of whether an ad is inherently misleading or false to the court, despite the fact that reasonable minds can differ.

■■■■ Though the court is not required to apply the FTC's standards to a case involving advertising of professional services, the result is the same. Under the Federal Trade Commission Act, 15 U.S.C. §§ 45, 52, "an advertisement is deceptive ... if it is likely to mislead consumers, acting reasonably under the circumstances, in a material respect." *Kraft, Inc. v. Federal Trade Comm'n,* 970 F.2d 311, 314 (7th Cir.1992). "In implementing this standard, the Commission examines the *overall net impression* of an ad and engages in a three-part inquiry: (1) what claims are conveyed in the ad; (2) are those claims false or misleading; and (3) are those claims material to prospective consumers." *Id.* (emphasis added). In determining what claims are conveyed, the FTC relies on its own viewing of the ad and, when necessary, extrinsic evidence. *See id.* at 318. The court finds that 2000 FEO 6 satisfies

the FTC's three-part inquiry in arriving at its conclusion that the "Strategy Session" ad violates Rule 7.1.

*Kraft,* though it deals with an ad for consumer goods rather than for professional services, is strikingly similar to the facts at hand.[9] The FTC complaint in *Kraft* alleged that the challenged ads made two implied claims, neither of which was true—that a slice of Kraft Singles contains the same amount of calcium as five ounces of milk and that it contains more calcium than most imitation cheese slices. Kraft conceded that these claims, if made, were false, but it argued that the FTC erred as a matter of law in not requiring extrinsic evidence of consumer deception, just as Plaintiffs argue that the State Bar cannot prevail because it did not produce consumer studies.

Kraft, like Plaintiffs, argued that the FTC's subjective approach should be altered in light of evolving commercial speech doctrine.[10] The Seventh Circuit rejected Kraft's argument that the FTC should be required to rely on extrinsic evidence rather than its own subjective analysis in all cases involving allegedly implied claims. *See id.* at 318. Instead, the Seventh Circuit held that "the Commission may rely on its own reasoned analysis to determine what claims, *including implied ones,* are conveyed in a challenged ad, so long as those claims are reasonably

---

9. One key distinction between *Kraft v. Federal Trade Comm'n,* 970 F.2d 311 (7th Cir.1992), and the present case, however, is that *Kraft* involved literally true statements that had misleading implications. As discussed, the statements in the "Strategy Session" come from a fictional vignette. This fact serves as an additional justification for the court's finding that extrinsic evidence is not required to find that the ad is inherently misleading.

10. Unlike the appellant in *Kraft,* 970 F.2d at 320, who "acknowledge[d] the novelty of its argument," Plaintiffs "repeatedly ... urged

the State Bar to look at how this ad actually works in the real world," contending that case law required the State Bar to produce extrinsic evidence that the ad is misleading. (Trial Tr., Vol. II, at 206.) The court finds that the case law in no way requires this of Defendants. Moreover, even if the court accepts Plaintiffs' argument that FTC cases provide "the best guidance that's available to this court," *Kraft* indicates that the FTC shares Defendants' belief that no outside studies are necessary to show that Plaintiffs' implied claims are misleading. *Id.* at 208.

clear from the face of the advertisement." *Id.* at 319 (emphasis added). The court found that "Kraft's first amendment challenge is doomed by the Supreme Court's holding in *Zauderer,* which established that no first amendment concerns are raised when facially apparent implied claims are found without resort to extrinsic evidence." *Id.* at 320. Moreover, when confronted with claims that are implied, yet conspicuous, "common sense and administrative experience provide the Commission with adequate tools to make its findings." *Id.*

The court finds that the "Strategy Session" ad conveys a message that is reasonably clear on its face. Further, the court holds that the ad itself and the evidence introduced at trial support a finding that the message is inherently misleading. The ad is misleading in violation of Rule 7.1 for two reasons.[11] First, the ad's portrayal of the insurance industry constitutes a material misrepresentation of fact and omits facts necessary to make the ad considered as a whole not materially misleading. Second, the vignette is likely to create an unjustified expectation that the lawyers advertised can obtain settlements based solely on their reputation and the insurance industry's fear of or reluctance to try a case against them.

A number of witnesses with extensive experience in the insurance industry testified about the factors taken into consideration in deciding to settle a case. Robert White Johnson (Johnson), a trial lawyer who has represented insurance companies in personal injury claims for 35 years, testified that insurance defense counsel and insurance companies consider the following factors: the existence of coverage, liability, availability and credibility of witnesses and the insured, injuries and other damages, and aggravating factors. Johnson stated that the reputation of the plaintiff's attorney is "less than five percent of the equation" calculated by insurance defense lawyers and companies and that he has never seen the lawyer's reputation treated as a major factor. (Trial Tr., Vol. I, at 217.) Johnson also stated that he had seen insurance companies use delay or denial as a tactic only "very rarely." *Id.* at 219.

Gary Parsons (Parsons), whose practice consists of 85 to 90 percent personal injury litigation, testified that he has dealt with insurance companies regarding the settlement and evaluation of claims on a daily basis for the past 18 or 19 years. He named the same factors as Johnson; likewise, he stated that the reputation of the plaintiff's attorney is never the sole or determinative factor in deciding whether to settle a case. Parsons testified that the "Strategy Session" ad does "[n]ot at all" accurately portray the process by which insurance claims are evaluated and settled. (Trial Tr., Vol. II, at 124.) In addition, though he has participated in meetings and conference calls with insurance companies, Parsons testified that he could not recall ever hearing discussion of delay or denial as a tactic.

Robert Whitley (R. Whitley), a plaintiff's attorney in personal injury cases for 27 years, testified that he has handled thousands of personal injury cases and dealt with hundreds of insurance companies doing business in North Carolina. R. Whitley said the most important factor

---

**11.** Though the constitutionality of Rule 7.1 has not been challenged, the court notes that a similar rule defining an ad as misleading if it creates unjustified expectations about results the lawyer can achieve has been upheld as constitutional. *See Jacobs v. Florida Bar,* 50 F.3d 901 (11th Cir.1995). In addition, 47 of the 50 state rules of professional conduct for attorneys include a similar definition of misleading ads.

considered by insurance companies is the insured's liability. In addition, he stated that insurance companies consider contributory negligence, damages, aggravating factors, and the background of the claimant. According to R. Whitley, the experience of the plaintiff's attorney is only one of many factors considered.

Emmett McCall (McCall), a state-certified mediator whose primary area of practice is business law, testified for Plaintiffs. On cross examination he stated that a multitude of factors, the same ones mentioned by the other witnesses, go into determining whether a case settles at mediation. McCall's experience as a mediator is not necessarily relevant to what occurs in a meeting of claims adjusters prior to deciding to settle. Nonetheless, McCall testified that at the mediation stage, the lawyer's reputation could affect the range of settlement, but that insurance companies do not settle personal injury claims based solely on the reputation of the plaintiff's attorney without regard to the facts. In fact, McCall admitted that it would be "more than misleading" for a lawyer to tell a client that he or she could settle any case, regardless of the facts. (Trial Tr., Vol. III, at 19.)

Valerie Loftin (Loftin), vice president of corporate risk management and claims at Jefferson Pilot Corporation, has been involved in the evaluation and resolution of hundreds, if not thousands, of insurance claims both as a lawyer defending insurance claims while in private practice and as an executive working with claims management for Nationwide Insurance Company and Jefferson Pilot Company since 1987. In Loftin's experience, insurance companies consider three basic factors—coverage, liability, and damages. She stated that, based on her experience, the ad does not accurately portray the claims process because it implies that the sole factor considered is the identity of the plaintiff's lawyer, and at Jefferson Pilot the reputation of the plaintiff's attorney was not considered in evaluating a claim and deciding whether to settle. Loftin also stated that the "delay or deny" tactic is not even sensible, since adjusters are evaluated by how quickly they can close claims.

Finally, Thomas Whitley (T. Whitley), who worked as a claims adjuster for Nationwide Mutual Insurance Company for 33 years before retiring, testified that insurance companies consider the same factors mentioned by the other witnesses. He stated that the reputation of the plaintiff's lawyer was never the sole or even a major factor in determining whether a case would be settled or in valuing the claim. Like McCall, T. Whitley testified that insurance companies that have already decided to settle will take the reputation of the plaintiff's lawyer into consideration when deciding where to settle within their selected range. T. Whitley testified that he participated in meetings with claims managers, but the ad does not accurately portray such a meeting. According to T. Whitley, claims adjusters have already weighed the many factors present and decided whether to settle before such a meeting; the meetings are held to discuss the settlement amount. Moreover, he stated that in 33 years he had never participated in any discussions suggesting delay or denial of a claim.

The court also heard testimony from two experts in the field of legal ethics and professional responsibility. Willis Whichard (Whichard), dean of and professor of law at Campbell University School of Law, and Thomas Metzloff (Metzloff), senior associate dean for academic affairs and professor of law at Duke University School of Law, testified that the ad is inherently misleading because it suggests that an insurance company would change from a

strategy of delaying or denying an insurance claim to a strategy of settlement based solely on hearing the name of the advertising lawyer. Both Whichard and Metzloff serve as advisory members of the Ethics Committee of the State Bar and voted in favor of 2000 FEO 6. In addition, they testified that the ad implies that it would be standard for an insurance company to consider delaying or denying an injured plaintiff's claim, but hiring the advertising attorney will result in settlement without any mention of the merits of the case.

■ The court also heard testimony from Dr. William Boulding (Boulding), tendered by Defendants as an expert in the field of marketing and advertising, and Dr. Carol Pardun (Pardun), tendered by Plaintiffs as an expert in the field of advertising and mass communication. Boulding and Pardun testified as to whether they believed the ad conveyed the message alleged by the State Bar. The court finds that expert testimony is not necessary to determine that the ad is misleading on its face. Nonetheless, some of the comments of Boulding and Pardun bear mentioning by the court.

Boulding testified that, from a marketing perspective, legal services are inherently different from other consumer goods and services because it is impossible to compare the result achieved to other cases, making it difficult for consumers to evaluate the legal services they have received. He also testified that it is therefore not surprising that consumers have not complained about the ad because it would be difficult for consumers to determine whether they had been misled by the ad. Pardun testified that the ad was used to create brand awareness and not to convey any particular message. Pardun stated that in her opinion the ad was not inherently misleading for the following reasons:

(1) the objective of advertising is persuasion; (2) consumers understand that dramatizations are not meant to be taken literally; (3) use of a spokesperson like Robert Vaughn is permissible; (4) advertising clutter requires ads to be more outrageous to catch consumers' attention; (5) the FTC accommodates the reasonable consumer, not the gullible consumer; (6) it is difficult to determine the correlation between ads and a subsequent effect; and (7) the lack of empirical evidence demonstrating actual deception led Pardun to believe there was no deception.

The court finds that Pardun's testimony is not relevant to the issue before the court for several reasons. First, the ad is not misleading because it is persuasive; it is misleading because its persuasive quality stems from the implication that insurance companies will settle with the advertising law firm because of its reputation. Second, the use of dramatization was not a factor in the State Bar's decision. No one contends that, through the dramatization, viewers will mistake the actors for actual insurance adjusters; rather, the State Bar asserts that the ad implies that the advertising lawyers will obtain certain results. Likewise, the use of a spokesperson has not been challenged. The effect of clutter on advertising strategy is irrelevant, as is any correlation between an ad and its effect on the viewer. If the court were dealing with truthful claims that were nonetheless misleading, then the correlation would be relevant. Pardun's comment about advertising standards not protecting gullible consumers is irrelevant because the standard employed by the Supreme Court to lawyer advertising is not premised on the gullible consumer.

Finally, Pardun's basis for her opinion relies on the lack of empirical evidence of deception, which the court has found is not required under First Amendment stan-

dards. Moreover, the court notes that it is unlikely that viewers would know they had been deceived without knowledge of the insurance industry and the legal settlement process, the very reason the State Bar found the ad misleading. In addition, as Boulding testified, consumers of legal services cannot readily compare the results they received to other cases. The court also notes that it is unlikely that the average television viewer would know to contact the State Bar with a complaint about the ad's content. Based on the factors considered by Pardun, the court finds that her testimony is irrelevant to the question of whether the ad is inherently misleading.

The vignette is, as Plaintiffs concede, very limited as to the information it discloses, due to the fact that the entire ad is only 30 seconds long. The plot is quite simple—the junior man provides a very brief explanation that the claim is a large claim involving a serious auto accident to the senior man, who knows nothing about it.[12] The senior man asks the junior man how he suggests they handle the claim, and the junior man suggests the possibility of delaying or denying the claim to make the plaintiff "crack," both strategies involving bad faith on the part of the insurance company. The senior man asks who the plaintiff's lawyer is, at which point the junior man grimly names either Farrin or Lewis and Daggett. Though Plaintiffs argue that the expressions on the men's faces are subject to multiple interpretations, the court finds that position to be unpersuasive. As Daggett testified, the ad involves good acting. The court further finds that the acting was so good that

there can be no other reasonable interpretation of their expressions.

A reasonable consumer viewing the ad might use a different adjective than the court to describe the expressions, but any such term would be a synonym for dismay or shock. The junior man's expression clearly indicates that he knows the senior man will not be happy with the name of the firm he identifies. To further emphasize the import of the firm's name, a loud gong sounds as the name is spoken. The senior man's response is unmistakably one of surprise or alarm—his eyebrows shoot up, his eyes widen, and his voice rises as he repeats the name. The behavior is in sharp contrast to his earlier calm demeanor. The vignette ends with the senior man, who is portrayed as the only one making the decision regarding settlement, tightening his mouth into a grim expression as he says, "Let's settle this one."

No consumer studies are necessary to determine the message conveyed by the ad. Put simply, the ad creates the impression that insurance companies that would otherwise contemplate bad-faith tactics will decide to settle at the mere mention of a certain attorney's name, in this case, "James Scott Farrin" or "Lewis and Daggett." The most senior person in the strategy meeting, who is shown making the decision to settle by himself, is so intimidated by or wary of the plaintiff's firm that he decides to settle a case about which he knows nothing other than that it involves an auto accident resulting in a large claim. Nothing in the ad indicates that the senior man, the decision maker, knows whether the insurance company has

---

**12.** Though Plaintiffs argue that the words on the easel indicate that the vignette picks up at a point after which all the relevant factors have already been discussed, it defies common sense to believe that the adjusters would have already discussed coverage, liability, and the facts of the case and, yet, the senior man would still need to be informed that a serious auto accident was the subject of the claim. The only reasonable inference to be made from the ad is that the senior man has heard nothing about the claim until that moment.

any viable defenses, the extent of the injuries, or whether the plaintiff even has coverage.

Plaintiffs also argue that consumers do not parse ads frame by frame. Yet, they argue that consumers will understand from what appears on the screen that the participants in the meeting have already discussed critical issues such as coverage, liability, and damages because the background includes an easel, hardly noticeable unless attention is drawn to it and certainly not readable due to the short time it appears and the small handwriting. It is doubtful that a consumer would even notice the easel without the kind of parsing that occurred at trial during Plaintiffs' examination of the witnesses. On the other hand, no parsing is required to understand the gist of the vignette.

Plaintiffs point to the testimony of T. Whitley and Johnson as evidence that claims adjusters would only meet if the claim were serious and that those factors have therefore already been considered. There are, however, some defects in that argument. The average consumer would have no knowledge of the claims process and can hardly be expected to understand that the most important factors considered by the insurance company have already been discussed. Nor is it reasonable to believe such a discussion occurred, in light of the fact that the junior man has not decided whether the claim should be settled, and the brief explanation given to the senior man indicates that he is only hearing of the claim for the first time at the point where the vignette begins. In addition, T. Whitley testified that, though he participated in similar meetings as a claims adjuster, the decision to settle had usually been made before the meeting. In addition, he testified that the insurance company's defenses had already been considered and that the meeting concerned only the *amount* of the settlement. Therefore, the content of actual meetings was completely different from that of the "Strategy Session." Further, though T. Whitley testified that an attorney's reputation could affect the insurance company's decision on whether to settle in the high or low end of the range, he stated that it was never the sole or even a major factor in deciding to settle the case or in assigning a range to the case.

Plaintiffs argue that the State Bar's approach to the case is elitist and patronizing because it assumes that consumers would be misled by a dramatization intended to be funny and clever. The court accepts Pardun's statement that clever ads will be remembered longer than dull ones, but cleverness cannot be vindicated at the expense of misleading the public. Ironically, Plaintiffs also argued that "real people," unlike the lawyers and other professionals involved in this case, could not possibly glean the message that insurance companies are so intimidated by the lawyers advertised that they will settle with them, because the average consumer watches so much television and is inundated with so much clutter from the media that any message would be lost on them. (Trial Tr., Closing Arguments, at 11.) Yet, Plaintiffs contend that these same hapless consumers are savvy enough about the insurance industry to assume that the senior man in the "Strategy Session" would have considered a myriad of factors before declaring, "Let's settle this one."

Plaintiffs argue that it would be impossible to incorporate so many considerations into such a short time frame. This may well be true, but this only highlights the increased danger of misleading the public inherent in dramatizations. The Supreme Court of Arizona, sitting en banc, in *Zang*, 741 P.2d at 278–79, explained why "sophisticated," persuasive

ads are often misleading: "While no doubt effective in attracting clients, dramatic, nonfactual advertisements are more likely to misrepresent or omit material facts, or to create unjustified expectations about the results a lawyer can achieve than are advertisements that primarily convey factual information that will help consumers make rational decisions about whether to seek legal services."

The court finds it neither patronizing nor elitist to credit consumers with the ability to understand the gist of the ad, that hiring the attorneys advertised will result in a settlement where the insurance company would otherwise have balked. Further, common sense refutes Pardun's testimony that the ad created name recognition alone and did not convey a message. If that were the case, the vignette could have concluded with the sound of the gong. It is simply disingenuous for Plaintiffs to argue that consumers live in such a media-saturated market that ads can no longer penetrate their consciousness when Daggett testified that the firm would run the ad again if it prevailed, and there was testimony that the number of calls received by Farrin's firm increased a minimum of two to three times over the previous rates before the ad was pulled. (Trial Tr., Vol. I, at 132, Vol. II, at 65.)

> The comment to Rule 7.1 explains that [t]he prohibition in paragraph (b) of statements that may create 'unjustified expectations' would ordinarily preclude advertisements about results obtained on behalf of a client, such as the amount of a damage award or the lawyer's record in obtaining favorable verdicts, and advertisements containing client endorsements. Such information may create the unjustified expectation that similar results can be obtained for others without reference to the specific factual and legal circumstances.

The comment targets the flaw in the ad's message—for the ad implies that insurance companies settle with Lewis and Daggett or Farrin because of their reputation *regardless of the facts*.

■ Though Mine's initial reaction to the "Strategy Session" was that it violated Rule 7.1, she was persuaded otherwise by reasons the court finds immaterial to the issue at hand. Mine had expressed concern that the statement "Let's settle it" created unjustified expectations about the results the firm could achieve. Lewis told Mine that the Lewis and Daggett law firm settled more than 95 percent of the cases they accept and that they would include a disclaimer stating "no specific results implied." At that point, Mine indicated that Lewis had made good points and that she personally did not feel the ad violated Rule 7.1. However, neither a disclaimer nor the settlement rate of the attorneys alters the misleading nature of the ad.

First, the existence of a disclaimer stating that no specific result was implied by the vignette does nothing to prevent the conclusion that the ad is inherently misleading. It would defeat the purpose of Rule 7.1 and other advertising regulations if the advertiser could employ deceptive and misleading methods so long as the ad included a disclaimer of what was portrayed. Further, the size, lightness of the disclaimer font against a black and white scene, and brevity of its appearance render the disclaimer entirely ineffective. *See JTH Tax, Inc. v. H & R Block Eastern Tax Servs., Inc.*, 128 F.Supp.2d 926, 936 (E.D.Va.2001) (finding the ad, like the one in *Zauderer*, literally true but misleading and finding the "minuscule superimposed legal disclaimer" entirely ineffective "[b]ecause of the very small size of the disclaimer, the light color of the text, and the three seconds or less the disclaimer is actually on the screen, particularly when

viewed on a television at a reasonable viewing distance").

Second, with regard to settlement rates, there was testimony that on average nine of ten lawsuits settle without going to trial. Therefore, Lewis and Daggett's settlement rate is not unusual. However, the ad implies that insurance companies will avoid settlement unless the plaintiff hires the advertising lawyer, making the senior man's decision to settle seem unusual.[13] Further, advertising that a lawyer obtains more settlements than others creates unjustified expectations regardless of whether he or she has a high or low settlement rate. If Lewis and Daggett advertised their high settlement rate, the ad would be a clear violation of Rule 7.1. Likewise, if the ad stated explicitly that insurance companies settle with the advertising lawyer because they are afraid to go to trial against him, the ad would violate the rule. Similarly, it would be impermissible for an actual client to make such a representation.

Plaintiffs cannot circumvent Rule 7.1 by using actors to portray that same message without saying it explicitly. The ad may win awards for a clever approach, but it violates the prohibition against misleading ads just the same. In essence, the vignette serves the same purpose as a client testimonial—it persuades people to call the advertising lawyer by using an outsider to endorse him. Other courts have rejected similar ads that either use testimonials or hint at the attorney's ability to obtain set-tlements. *See, e.g., In the Matter of Wamsley,* 725 N.E.2d 75 (Ind.2000) (holding that the advertised statement "Best Possible Settlement ... Least Amount of Time" created an unjustified expectation of such a result in any case the lawyer agreed to handle); *Office of Disciplinary Counsel v. Shane,* 81 Ohio St.3d 494, 692 N.E.2d 571, 573 (1998) (explaining that comments about past successes create unjustified expectations because "there is no way to objectively determine whether the results achieved by the firm were exceptional, adequate, or poor, or even whether the firm was instrumental in the outcome of the cases"); *In the Matter of Anonymous,* 689 N.E.2d 442, 444 (Ind.1997) (holding that an ad stating that the respondents "offer[ed] the track record and resources you need to win a settlement" was likely to create the unjustified expectation that similar results could be obtained in every claim "without reference to the specific factual and legal circumstances of the particular claims or cases").

The "Strategy Session" raises the same problems, though it makes no explicit mention of the firm's reputation or record. The change in tactics and alarmed expression on the senior man's face, coupled with Vaughn's statement that "North Carolina insurance companies *know* the name Lewis and Daggett" imply that insurance companies will decide to settle a case simply because the advertising lawyer is representing the plaintiff—before the decision

---

**13.** Given Plaintiffs' own evidence that neither Farrin nor any attorney in his firm has ever tried a case, with the exception of sitting as second chair in one trial in which the opposing party prevailed. Given McCall's testimony that an insurance company would find it very important that the plaintiff's attorney had never tried a case when deciding on where to settle in the range, the court notes that it is particularly misleading for Farrin to use an ad suggesting that insurance compa-nies are so intimidated by his reputation that they would change tactics. *See In the Matter of Zang,* 154 Ariz. 134, 741 P.2d 267, 275 (1987) (finding firm's ad implying that it was willing and able to try, and actually did try, personal injury cases misleading where no attorney at the firm had ever tried a personal injury case to a conclusion). However, as explained with regard to settlement rates, the ad would be equally misleading even if Farrin was well known for his trial advocacy.

maker even knows anything about coverage, liability, or settlement. This implication is likely to create an unjustified expectation of settlement. A reasonable person not versed in legal matters could believe from watching the ad that Lewis and Daggett or Farrin obtain settlements based solely on their past track record with insurance companies. The trial evidence clearly reveals that, no matter how good a lawyer is, no one can obtain a settlement without consideration of the facts.

Based on the above findings of fact, the court's viewing of the ad itself, and the evidence presented at trial, the court finds that the "Strategy Session" is inherently misleading.

## CONCLUSIONS OF LAW

1. This action arises under the First and Fourteenth Amendments to the United States Constitution. Plaintiffs brought this action pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 and the Civil Rights Act, 42 U.S.C. §§ 1983 and 1988.

2. The court has jurisdiction of this action pursuant to 28 U.S.C. § 1331. Venue lies in this court pursuant to 28 U.S.C. § 1391(b). In adopting and approving 2000 FEO 6, Defendants acted under color of state law.

3. The State Bar was not required to produce extrinsic evidence that consumers were misled by the "Strategy Session" ad because it is misleading on its face. Therefore, the ad is not commercial speech protected by the First Amendment, and the State Bar acted properly in adopting 2000 FEO 6.

A judgment in accordance with these findings of fact and conclusions of law shall be filed contemporaneously herewith.

## MEMORANDUM OPINION
## *and ORDER*

Plaintiff James Scott Farrin (Farrin) has moved the court to amend its findings of fact and conclusions of law as entered in support of the court's July 19, 2001, judgment by deleting footnote 13 on page 42. As discussed below, the court will amend footnote 13 to reflect the narrow tailoring of the question asked during a bench trial conducted April 16 through April 18, 2001. For the reasons that follow, however, the court will deny Plaintiff's request to delete footnote 13.

## I. FACTUAL BACKGROUND

Plaintiffs Farrin and Michael Lewis (Lewis), David D. Daggett (Daggett), and Market Masters—Legal, a Resonance Company, Inc. (Market Masters) brought the underlying action to challenge on First Amendment grounds the North Carolina State Bar's decision that the "Strategy Session" ad run by Farrin and Lewis and Daggett was misleading and created unjustified expectations in violation of Rule 7.1 of the Revised Rules of Professional Conduct.

Footnote 13 of the court's July 19, 2001, decision states:

There was evidence that neither Farrin nor any attorney in his firm has ever tried a case, with the exception of sitting as second chair in one trial in which the opposing party prevailed. Given testimony from a witness for Plaintiffs that an insurance company would find it very important that a plaintiff's attorney had never tried a case when deciding on where to settle in the range, the court notes that it is particularly misleading for Farrin to use an ad suggesting that insurance companies are so intimidated by his reputation that they would change tactics. *See In the Matter of Zang*, 154 Ariz. 134, 741 P.2d 267, 275

(1987) (finding firm's ad implying that it was willing and able to try, and actually did try, personal injury cases misleading where no attorney at the firm had ever tried a personal injury case to a conclusion). However, as explained with regard to settlement rates, the ad would be misleading even if Farrin was well known for his trial advocacy.

Plaintiff contends that footnote 13 should be deleted because it is irrelevant to the court's judgment, as well as being "predicated on the Court's apparent misunderstanding or incomplete understanding of the underlying facts." (Mem. Supp. Mot. Amend at 1.) In addition, Plaintiff argues that the footnote is "highly defamatory of Mr. Farrin and the other attorneys affiliated with the law firm of James S. Farrin, P.C." (Id.) Moreover, he contends that the footnote is likely to mislead potential clients and other readers of the July 19, 2001, findings of fact and conclusions of law. Farrin offers his own affidavit in support of these contentions.

The testimony in dispute arises from Defendants' direct examination of Farrin. The relevant portion of the testimony follows:

Q During the period from 1990 through the time when you finished running the Strategy Session ad, how many personal injury trials had you personally tried?

A One.

Q And that was the case where you were the second chair, is that correct?

A Yes, it is.

Q And in that instance there was a defense verdict, is that correct?

A Yes.

Q In 1997 you formed your law firm, is that correct?

A I believe so.

Q How many lawyers are in your firm?

A Nine.

MR. STEVENS: Objection, Your Honor. With all due respect, the case that the Defendants are attempting to make is that the ad is inherently misleading.

As I perceive this line of questioning, they're attempting to prove another point, but perhaps hoping to, and that is that it is somehow misleading with respect to Mr. Farrin, but that's not their case. They have not pleaded that. They have not based their opinion on that.

And I'm happy to have him answer questions, but I don't see the relevance in this line of questioning in light of the posture that the defense is in here.

THE COURT: Well, as to all of the witnesses, some background is—has been allowed, but I do cut it off shortly, and I will, unless there is some other reason. So, I'm going to allow this question, but we're coming close to the end now.

THE WITNESS: Did you hear my answer?

MR. MOFFITT: No, I did not.

THE WITNESS: Nine attorneys.

THE COURT: Nine?

THE WITNESS: Nine.

BY MR. MOFFITT:

Q In the period of time since your law firm was formed until the end of that ad when the ad stopped running, not a single lawyer from your law firm tried a case under the trade name of The Law Offices of James Scott Farrin, isn't that correct?

A I believe so.

THE COURT: When you say "I believe," are you really saying yes, or are you saying maybe, or what are you saying, I believe?

THE WITNESS: The answer is yes, if I understood the question, did the lawyers in the—presently in the firm were trying cases at that time, but not under the trade name James Scott Farrin, maybe with other firms. But if I understood the question correctly, the answer is yes.

THE COURT: Well, do you think you understood the question correctly?

THE WITNESS: I believe so, yes.

(Trial Tr., Vol. II, at 4–5.)

## II. DISCUSSION

The court will deny Plaintiff's motion for a number of reasons. First, Farrin seeks to amend the evidence presented at trial, a matter that is not timely raised. If Plaintiff had objections to the record before the court, the proper time to object was during the bench trial. Plaintiff argues that the court misunderstood the inner workings of Farrin's law firm because Farrin was "afforded no opportunity at trial" to explain his role. (Mem. Supp. Mot. Amend at 5.) The record simply contradicts Plaintiff's contentions and, as discussed below, Plaintiff had ample opportunity to supplement the "paucity of the record" but did not do so. (*Id.*) Plaintiff cannot remain silent during trial and then supplement the trial evidence with an affidavit after judgment has been entered.

There were ways in which this matter could have been properly raised, none of which was done. Plaintiff's counsel had the opportunity to reiterate his objection or raise a continuing objection to Defendants' line of questioning after the court allowed Defendants to proceed, but he did neither. Nor is there anything in the record indicating that Farrin was prevented from explaining his answers more fully. Alternately, Plaintiff's counsel had the opportunity to elicit the information presented in Farrin's affidavit on cross examination, though he did not do so. Now Plaintiff contends that his counsel "perceived that the Court deemed this testimony to be non-germane, and thus did not revisit it on cross-examination." (*Id.* at 3.) The fact that the court allowed the questions after counsel's objection reflects the court's judgment that the questions were relevant. Nothing in the record suggests that the decision not to elicit further explanation on cross examination was based on anything other than Plaintiff's counsel's view of the matter. Regardless of counsel's reasoning, the information presented in Farrin's affidavit was not introduced at trial and cannot be introduced into evidence *ex post facto.*

Second, Defendants' questions were clearly relevant, given the evidence introduced by Plaintiffs both on direct and cross examination. Witnesses for Plaintiffs testified as to the reputation of Lewis and Daggett in the legal community, and Plaintiffs' counsel examined each witness as to whether an attorney's reputation was considered when deciding to settle. Further, Plaintiffs sought to introduce evidence of bad faith tactics employed by the insurance industry to support their contention that the "Strategy Session" ad accurately portrayed the industry. Hence, the accuracy and reputation of the attorneys advertised, as well as the ad's portrayal of the insurance industry, were made an issue by Plaintiffs and were an appropriate matter to be explored by Defendants. Though Defendants' case rose or fell on the question of whether the "Strategy Session" ad was inherently misleading, that does not mean that footnote 13 is irrelevant. The footnote simply notes that, in light of the evidence presented *at trial,* Farrin's lack of trial experience contradicts Plaintiffs' suggestion that the ad could not be misleading because the attor-

neys advertised were well known in the insurance industry.[1]

Finally, Plaintiff's contention that footnote 13 impugns the attorneys of Farrin's law firm in their profession is not a reason to amend the evidence. The footnote is not defamatory simply because it points out the fact that no lawyer has tried a case under the trade name "The Law Offices of James Scott Farrin."[2] Whether or not it is information that would be well received by potential clients is not a matter to be considered by the court. While Plaintiff may find the fact to be potentially harmful to the law firm, it is nonetheless a fact that Farrin himself acknowledged with no explanation. Because it has direct bearing on the analysis conducted by the court, the footnote will remain, with the following amendment to reflect the narrow question asked by Defendants.

## III. CONCLUSION

Footnote 13 as stated in the court's July 19, 2001, findings of fact and conclusions of law is not as narrowly tailored as the question put forth by Defendants, in that it could be read to state that the other attorneys in Farrin's law firm have never tried a case. More precisely and accurately, they have not tried cases under the trade name of "The Law Offices of James Scott Farrin," the law firm advertised in the "Strategy Session." However, it remains that Farrin himself during his entire practice has participated in only one trial, which resulted in an adverse verdict.

For the reasons stated in the memorandum opinion filed contemporaneously herewith,

IT IS ORDERED AND ADJUDGED that Plaintiff's motion to amend the findings of fact and conclusions of law [52] is granted in part and denied in part.

IT IS FURTHER ORDERED that footnote 13 shall be amended to read as follows:

There was evidence that Farrin had never tried a case, with the exception of sitting as second chair in one trial in which the opposing party prevailed. In addition, there was evidence that no attorney from Farrin's law firm had tried a case under the trade name of "The Law Offices of James Scott Farrin." Given testimony from a witness for Plaintiffs that an insurance company would find it very important that a plaintiff's attorney had never tried a case when deciding on where to settle in the range, the court notes that it is particularly misleading for Farrin to use an ad suggesting that insurance companies are so intimidated by his reputation that they would change tactics. *See In the Matter of Zang*, 154 Ariz. 134, 741 P.2d 267, 275 (1987) (finding firm's ad implying that it was willing and able to try, and actually did try, personal injury cases misleading where no attorney at the firm had ever tried a personal injury case to a conclusion). However, as explained with regard to settlement rates, the ad would be misleading even if Far-

1. Plaintiff also argues that Defendants' proposed findings of fact and conclusions of law "did not suggest that the court should or could make any findings based on this line of testimony." (Mem. Supp. Mot. Amend at 3.) Though the court certainly considers the parties' proposed findings of fact and conclusions of law, it draws its own conclusions as to both and is in no way limited by the parties' sub-

missions. Moreover, the court in footnote 13 made no finding of fact. It simply noted that, given Plaintiffs' own evidence at trial, Farrin's lack of trial experience added another level of inaccuracy to the ad, though it was deceptive regardless.

2. The footnote will be amended to clarify that fact.

rin were well known for his trial advocacy.

IT IS FURTHER ORDERED that the Clerk of Court shall imprint upon the margin of the Findings of Fact and Conclusions of Law filed July 19, 2001, to denote the following:

These Findings of Fact and Conclusions of Law are amended and superseded by the Memorandum Opinion and Order filed August 16, 2001, in that footnote 13 only is modified.